Ricky MAYFIELD, Appellant

v.

The STATE of Texas, Appellee.

No. 12–93–00072–CR.

Court of Appeals of Texas,
Tyler.

Jan. 27, 1995.

Rehearing Overruled April 7, 1995.

Discretionary Review Refused
Aug. 23, 1995.

---

Ardon Moore, Tyler, for appellant.

Ed Marty, Tyler, for appellee.

HOLCOMB, Justice.

A jury convicted Appellant of engaging in organized criminal activity and sentenced him to 32 years in prison. Appellant assigns six points of error. In his first two points,

Appellant challenges the sufficiency of the evidence to support his conviction. In the next four points, Appellant contends that the court erred when it: (1) refused to instruct the jury on accomplice testimony; (2) failed to quash his indictment; (3) admitted into evidence the acts of co-defendants; and (4) failed to quash the jury, which permitted the State to use its strikes in a discriminatory manner. We will affirm.

To better manage various alleged criminal activity in the neighborhoods, the Tyler Police Department divided Tyler into four sections geographically and assigned patrol officers to each section. One of the areas known for frequent drug trafficking, particularly crack cocaine, is referred to as "the Cut." "The Cut" is an area at the intersection of Dargan, Vance, and Palace Streets near Texas College. It is called "the Cut" because Palace Street zigzags at the intersection and people openly congregate at this intersection to buy and sell crack cocaine. In an effort to reduce or stop the "open air drug market," Tyler police began a covert surveillance operation in an apartment building nearby. For a period of three days during 1991, officer Steve Sharron used a video camcorder with a night scope and recorded the activities at "the Cut" for several hours. The tapes showed that dealers approached the cars as they stopped at the intersection and exchanged money for "rocks" of cocaine. During the three day surveillance, the same individuals continuously supplied, delivered, and displayed drugs. Undercover officer Bledsoe wore a "body-mike" and made several "buys" of crack cocaine from various dealers. After approximately 20 transactions were recorded, a raid ensued. Most of the "rocks" were laboratory tested and verified as crack cocaine; however, some of the rocks were found to be sheetrock. Appellant and several other individuals who appeared on the video tapes were arrested and indicted for delivery of a controlled substance, as well as for participating in an organized criminal activity.

In his first two points, Appellant challenges the sufficiency of the evidence to support his conviction. He argues that the State did not present any evidence to prove that he committed the underlying offense of delivery of a controlled substance, nor did it present any evidence that he conspired with others to participate in a combination in furtherance of a criminal activity. *See* TEX.PENAL CODE ANN. & 29.02 (Vernon 1989). After reviewing the record, we hold that the evidence was sufficient for the jury to conclude that Appellant operated within an orchestrated scheme to deliver a controlled substance.

■ In determining whether a conviction was supported by sufficient evidence, we view the evidence presented in the light most favorable to the verdict. *See Flournoy v. State*, 668 S.W.2d 380, 383 (Tex.Cr.App.1984). The critical inquiry is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Bonham v. State*, 680 S.W.2d 815, 819 (Tex.Cr.App.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153. This standard places full responsibility on the trier of fact to weigh the evidence, to resolve conflicts in the testimony, and to draw reasonable inferences from basic to ultimate facts. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). If there is evidence to establish the defendant's guilt beyond a reasonable doubt, and the jury believes the evidence, the appellate court cannot reverse the judgment on an evidence point. *See Soto v. State*, 864 S.W.2d 687, 691 (Tex.App.—Houston [14th Dist.] 1993, pet ref'd).

■ To be convicted of the offense of participating in an organized criminal activity, the actor must have committed, or must have conspired to commit, a crime with the specific intent to participate in that crime with a number of persons. *See Barber v. State*, 764 S.W.2d 232, 234 (Tex.Cr.App.1988); *see also, Richardson*, 763 S.W.2d at 596. The underlying crime in Appellant's case is the delivery of a controlled substance. By definition, a person "conspires to commit" a crime when he agrees with others to engage in conduct that would constitute an offense and performs some overt act pursuant to their agreement. TEX.PENAL CODE ANN. § 71.01 (Vernon 1994). Many times an "agreement" that constitutes a conspiracy has to be inferred from the parties' conduct. *Id.* The

State must prove that Appellant intended to be a part of a combination, and that he intended to participate in the profits of that combination. *Childress v. State*, 807 S.W.2d 424, 435 (Tex.App.—Amarillo 1991, no pet.); *Richardson v. State*, 763 S.W.2d 594, 596 (Tex.App.—Corpus Christi 1988, no pet.). The State must also prove that the accused knew of the criminal activity of the group. *Nickerson v. State*, 686 S.W.2d 294, 297 (Tex. App.—Houston [14th Dist.] 1985, pet. ref'd.).

■ As in all conspiracy cases, it is difficult for the State to prove that Appellant intended to act within a combination. Direct evidence is rarely available. Typically, the State has to offer evidence of Appellant's conduct, as well as the surrounding circumstances, to show that he had knowledge of the criminal activity within the group, and that he intended to participate. *Nickerson v. State*, 686 S.W.2d 294, 297 (Tex.App.—Houston [14th Dist.] 1985, pet ref'd). Similar methods of operation, joint activities within the group, and methods of communication "understood" within the group are acts that tend to support the finding of conspiracy.

■ During this particular surveillance period at "the Cut," the evidence shows that Officer Bledsoe drove into the intersection late in the evening of August 30, 1991. The evidence is conflicting as to whether Appellant approached Officer Bledsoe or whether Bledsoe waived Appellant over to his car. Bledsoe told Appellant that he wanted a $20.00 rock of cocaine. After Appellant informs Bledsoe that he did not have any drugs, Appellant then attempts to get Bledsoe to "trust" him and front him money so that he can buy some cocaine for Bledsoe. Bledsoe refused. Appellant then offered to get in Bledsoe's car and drive around to look for someone who was selling cocaine. Again, Bledsoe refused.

Appellant continues to ask Bledsoe to front him $20.00. Appellant then sees Dexter Cravens, who is a "main dealer" that was indicted along with Appellant for his involvement in drug activity within "the Cut." Cravens was initially hesitant to sell to Bledsoe because he suspected that Bledsoe was an undercover agent. Appellant then goes to a residence on West Vance Street, which is the location where main dealers congregate and assist the "street sellers" in replenishing their supply of drugs. However, Appellant returned without any drugs for Bledsoe. Appellant then rejoins Cravens, and Cravens eventually sells Bledsoe a rock of cocaine in exchange for $20.00. After the sale, Appellant requested that Bledsoe give him a "bump" from Bledsoe's rock because he had "worked hard for it." Bledsoe gave Appellant a bump.

At trial, the State admitted into evidence the video tape that undercover officer Sharron had made at "the Cut" during the period of surveillance. During a period of three hours, Appellant appears on the film approximately eighteen times. At various times, Appellant was seen intermingling with at least five other persons who were reputed to be either main dealers or street sellers. At one juncture, Appellant was taped approaching a car, delivering what appeared to be cocaine to the driver, receiving money in exchange for the delivery, and then giving Patrick Weldon, a main dealer, the money.

At trial, Dexter Cravens was offered immunity by the State in exchange for his testimony about the activities at "the Cut." He explained to the jury the procedure commonly used at "the Cut" between main dealers and street sellers to sell drugs. According to Cravens, main dealers do not like to make the sales themselves because they want to reduce the risk of being "busted." It is either the street sellers or "fiends" who exchange drugs for money with the buyers. After a sale is made, the street sellers or fiends return the money to the main dealer. The street sellers generally receive money as a commission for the sale; however, a fiend generally receives a bump of rock cocaine as a commission for the sale.

Although Cravens was subpoenaed by Appellant and attempted to testify in favor of Appellant, the statements that he made were contradictory to a written statement that he had previously given to the police. At trial, Cravens initially stated that he was surprised that Appellant had been implicated along with the others for the activities at "the Cut." He denied that he and Appellant were work-

ing together under any kind of understanding or agreement to sell drugs to Bledsoe and seemed confused by the word "conspiracy." He also denied knowing that anyone who was selling drugs at "the Cut" was working within an agreement. However, the State admitted Exhibit 46, which was a written statement that Cravens had made to the police shortly after he was arrested. In that statement, Cravens said, "I saw Ricky Mayfield negotiate the sale of a rock for me to an undercover officer [Bledsoe] ... Ricky Mayfield is mostly a fiend. He will sell for a lot of different people so he can take a rock as payment." Cravens later admitted that late in the evening on August 30th and early in the morning on August 31st, Appellant "kind of helped [him] a little bit" by linking him with Bledsoe. Cravens also confirmed that Homer Neal and Patrick Weldon, along with himself, were main dealers at "the Cut" and had various people working for them to make sales. Although Cravens denies that there was any understanding between the main dealers, the street sellers, or the fiends in furtherance of the sale and delivery of cocaine, he acknowledged in his written statement that: "Everyone [at "the Cut"] knew what was going on with the rock selling. Everybody was up there to make a buck or make them some money by selling cocaine."

As a main dealer, Cravens also admitted that some of the sales that were made by street sellers and by fiends were arranged on the spur of the moment. "I can just walk up to "the Cut" and somebody come[s] to me, ... that's a fiend ... [and] say[s], if you would give me a little bump, I'll help you get rid of a couple of rocks...." When the prosecutor asked Cravens, in light of his experience as a main dealer, if that particular arrangement between himself and a fiend would be considered an "agreement," Cravens said: "Yes. You know, if they come and ask me like that, you know, there's got to be an agreement."

Cravens was then allowed to watch the part of the video in which Appellant approached a car, gave the driver something from his right hand, took money from the driver in his left hand and returned the money to Patrick Weldon. The prosecutor asked Cravens to tell the jury what Appellant appeared to be doing. Cravens answered: "He's trying to negotiate a sale." The prosecutor asked the following questions, which received these responses from Cravens:

Q: Why on earth would [Appellant] make a sale and then give the money to Patrick Weldon?

A: Because Patrick probably gave him some dope.

Q: How would [Appellant] know to bring the money back to Patrick Weldon?

A: Well, because it was [Weldon's] dope.

. . . . .

Q: Do you think [Patrick Weldon and Appellant] might have an agreement between them that, hey, Ricky, if you take this rock up to the car and sell it, you bring me the money back, I'll give you a bump or some money?

A: Based on what I seen, it looked like it.

Q: Looked like an agreement, otherwise, he wouldn't know to come back [to Weldon], would he?

A: That's right.

Appellant's attorney attempted to get Cravens to confirm that Appellant's actions with Patrick Weldon were typical of a "smoker" instead of a "dealer." However, the prosecutor cross-examined Cravens and asked: "When you saw [Appellant] approach that car [on the tape] and give the money to Patrick Weldon, [was Appellant] smoking or [was] he dealing?" Cravens answered: "That's dealing right there."

Bledsoe also testified that he had purchased cocaine from Ronnie Caddell during that same evening. After the sale, Appellant approached Bledsoe and informed him that Caddell had cheated him by selling him a piece of sheetrock instead of cocaine. The laboratory reports confirmed that Caddell had in fact sold Bledsoe sheetrock. Viewing the evidence in the light most favorable to the verdict, the jury could have reasonably found that Appellant operated within a well-orchestrated scheme to sell cocaine at "the Cut." At a minimum, the evidence revealed that Appellant: (1) assisted a main dealer in exchanging cocaine for money; (2) linked

potential buyers with potential sellers in exchange for a bump of rock cocaine; (3) understood the central location at which he could replenish his supply of drugs; (4) knew which street sellers sold sheetrock instead of cocaine to customers; and (5) informed the customers when they had been "ripped off" by a street seller who sold sheetrock. Points one and two are overruled.

In point three, Appellant contends that the court erred when it refused his request for the court to instruct the jury that Officer Bledsoe was an accomplice to the crime for which Appellant had been charged. He argues that the jury should have been properly instructed on the manner in which they were to weigh an accomplice's testimony. Appellant cites Section 38.14 of the TEXAS CODE OF CRIMINAL PROCEDURE in support of his position. Section 38.14 provides that Appellant cannot be convicted on the testimony of any accomplice unless it is corroborated by other evidence tending to connect the defendant with the offense committed. Appellant argues that Bledsoe was, as a matter of law, an accomplice to the crime in which Appellant was indicted. He points out that Cravens delivered cocaine to Bledsoe, then Bledsoe delivered a bump to Appellant. He reasons that the criminal transaction occurred between Cravens and Bledsoe, not between Appellant and Bledsoe and, as a result, Bledsoe was an accomplice. Both Appellant and Appellee cite Lopez v. State, 574 S.W.2d 563, 565 (Tex.Cr.App.1978). Lopez holds that undercover officers are not accomplices if they do not "bring about" the crime, but merely obtain evidence to be used against those engaged in the crime. See Lopez, 574 S.W.2d at 565. Any evidence that Bledsoe needed to convict other co-conspirators had already been obtained when Cravens delivered the controlled substance to Bledsoe. Therefore, Appellant concludes that his request for a bump from Bledsoe cannot be construed as Bledsoe's attempt to obtain evidence. To the contrary, Appellant argues that Bledsoe "brought about the crime" and was an accomplice. We do not agree.

Mere participation by an undercover officer in an act that would otherwise be criminal under other circumstances does not make the officer an accomplice. *Ramos v. State*, 632 S.W.2d 688, 690 (Tex.App.—Amarillo 1982, no pet.); *Ochoa v. State*, 444 S.W.2d 763, 764 (Tex.Cr.App.1969) (undercover officers who smoked marijuana with Appellants were not accomplices to possession). In *Cohea v. State*, 845 S.W.2d 448 (Tex.App.—Houston [1st Dist.] 1993, pet. refused), the court faced a similar situation. The defendant was convicted of delivery of a controlled substance, and undercover officers purchased cocaine from Appellant with the assistance of a woman named Jefferson. After the exchange of money for the cocaine occurred, the officers allowed Jefferson to take a pinch from one of the cocaine rocks. The court held that the officers were not accomplices although they gave a bump to Jefferson. *Cohea*, 845 S.W.2d. at 452.

In this case, Appellant linked Bledsoe to Cravens in an effort to facilitate a drug transaction. Requesting a bump from Bledsoe as compensation for facilitating that drug transaction was an overt act. Bledsoe's acts were not the act of an accomplice. Had Bledsoe refused Appellant's request, Appellant would have suspected that Bledsoe was not a legitimate purchaser and may have jeopardized the surveillance operation, as well as Bledsoe's life. As a result, the trial court did not err when it refused to instruct the jury that Bledsoe was an accomplice. Point three is overruled.

In point four, Appellant contends that the court erred when it denied his motion to quash the indictment. The indictment shows the date of the conspiracy to be "on or about the 15th day of September, 1991." However, the overt criminal acts were said to be "on or about the 31st day of August, 1991." Appellant argues that one cannot perform a criminal act in pursuance of an agreement if the overt act takes place before the agreement to conspire. Therefore, the question is whether the indictment is defective: (1) because the overt act occurred before the offense itself; or (2) because the allegations in the indictment did not afford Appellant adequate notice to prepare a defense.

■ An indictment is sufficient if it contains elements of the offense charged, fairly informs the defendant of charges he must be prepared to meet, and enables the defendant to plead acquittal and defend himself against the offense. *United States v. Moody*, 923 F.2d 341, 344 (5th Cir.1991); *Clark v. State*, 796 S.W.2d 551, 554 (Tex.App.—Dallas 1990, no pet.). Usually an indictment which tracks the language of the statute or conveys the same meaning as the statute is sufficient. Tex.Code Crim.Proc. art. 21.17 (Vernon Supp.1993); *King v. State*, 675 S.W.2d 514, 516 (Tex.Cr.App.1984); *Bynum v. State*, 767 S.W.2d 769, 778 (Tex.Cr.App.1989); *Hogue v. State*, 752 S.W.2d 585 (Tex.App.—Tyler 1987, pet. ref'd.). In this case, the indictment charges Appellant with violating the necessary elements of the offense.

To determine whether Appellant was deprived of notice, we must determine whether: (1) the indictment failed to convey the requisite notice to Appellant; (2) the deficiency in the indictment had an impact on Appellant's ability to prepare a defense; and (3) whether Appellant was harmed as a result of the deficiency. *Opdahl v. State*, 705 S.W.2d 697, 699 (Tex.Cr.App.1986). Although the indictment in this case does allege that the date of the offense occurs prior to the combination, both factual allegations are preceded by the words "on or about." If the State alleges in an indictment that the offense occurred "on or about" a certain date, the State may convict a defendant when it proves that the offense was committed any time before the return of the indictment, within the period of limitations. *Branson v. State*, 825 S.W.2d 162 (Tex.App.—Dallas 1992, no pet.). Therefore, we hold that any defects in Appellant's indictment did not substantially prejudice Appellant's rights. Point four is overruled.

■ In point five, Appellant contends that the court erred when it permitted testimony regarding co-defendants into evidence and admitted exhibits that were confiscated during the surveillance. Specifically, Appellant contends that the following evidence should not have been admitted over his objections:

(1) The crack cocaine that Cravens sold to Bledsoe.

(2) Bledsoe's testimony that he made various drug transactions that he made at "the Cut" with alleged co-conspirators.

(3) The crack cocaine and drug paraphernalia that was found on the ground at "the Cut" after the police raid, and

(4) various other items of physical evidence that linked the alleged co-conspirators to the delivery of cocaine, but did not link Appellant to the delivery of cocaine.

Appellant argues the State "dumped" the acts of the co-defendants in front of the jury, even though he was tried separately, which inflamed the minds of the jurors and prejudiced them against him. We hold that the trial judge properly admitted the evidence.

■ Conspiracy is an offense that is ordinarily established only by showing a great number of apparently disconnected circumstances. *Mutscher v. State*, 514 S.W.2d 905, 912 (Tex.Cr.App.1974). Each declaration or act of a co-conspirator within a conspiracy is admissible, even though it may have occurred outside the presence of the defendant. *Callaway v. State*, 818 S.W.2d 816 (Tex.App.—Amarillo 1991, pet ref'd). Because of the nature of the offense, evidence supporting a conspiracy encompasses everything within the contemplation of the conspirators and is terminated only after every act within the plan and breadth of the conspiracy has been performed. *Id.* The existence of a conspiracy is the essence of the allegations that were made against Appellant, and the State cannot prove conspiracy without introducing evidence of the actions of the people who committed a crime while in furtherance of the conspiracy. Thus, it was proper for the court to permit testimony regarding the co-conspirators' actions during the surveillance period, and it was proper for the court to admit the other exhibits into evidence. Tex. R.Crim.Evid. 801(2)(e). Although this evidence may be prejudicial to Appellant, its probative value is significant and outweighs the prejudicial effect to Appellant. Point five is overruled.

■ In his last point, Appellant contends that the court erred when it failed to quash the jury panel because the State exercised its

peremptory challenges to exclude African–American jurors for racially discriminatory reasons in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Appellant is black. Five African Americans were within the strike zone of the venire panel. The State challenged and struck two blacks, Whitaker and Warren. One black was struck by the court for cause. The record does not reflect whether the other two blacks actually served on the jury or whether they were removed by Appellant.

The trial court found that Appellant had sufficiently challenged the State and conducted a *Batson* hearing to determine whether the State had used its peremptory challenges in a discriminatory manner. After the hearing, the prosecutor testified that no challenges had been based upon race, and that all the State's strike had been exercised for race-neutral reasons. The reasons given by the prosecutor for each strike were:

(1) *David Warren*—The prosecutor stated that he struck Mr. Warren because he was an acquaintance of Dexter Cravens. He also struck Mr. Warren because Mr. Warren's sister had a criminal history.

(2) *Rosie Lee Whitaker*—The prosecutor stated that he struck Ms. Whitaker because she had "criminal histories coming back to her same address."

Although the reasons given by the prosecutor are on their face, race-neutral, Appellant describes the explanations as "weak" and a pretext to cloak a racially discriminatory use of the State's peremptory challenges. We do not agree.

The trial court's decision in a Batson challenge is reviewable by a clearly erroneous standard. *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Tennard v. State,* 802 S.W.2d 678, 680 (Tex.Cr.App.1990). The Appellate court affords great deference to the rulings of a trial judge. *Robinson v. State,* 851 S.W.2d 216 (Tex.Cr.App.1991). We examine the entire voir dire to determine if the prosecutor' explanations are legitimate. *Kemp v. State,* 846 S.W.2d 289, 290 (Tex.Cr.App.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993).

Procedurally, the trial court determines whether a defendant has made a prima facie challenge against the State for its strikes. Then, the burden shifts to the prosecutor to come forward with race-neutral reasons for the strikes. *Keeton v. State,* 749 S.W.2d 861, 866 (Tex.Cr.App.1988). The prosecutor must present clear, specific, and legitimate explanations for each challenge. *Brooks v. State,* 802 S.W.2d 692 (Tex.Cr.App. 1991). Being related to a person who has been charged or convicted with a crime is considered by the courts as a race-neutral use of a peremptory strike. *Hill v. State,* 827 S.W.2d 860, 865 (Tex.Cr.App.1992), *cert. denied,* — U.S. —, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992). In reviewing the record, three white veniremembers who had family members or had other relationships with a criminal background were also struck by the State. Without exception, all jurors regardless of their race, were removed by the State if they were related to, or had relationships with, people who had a criminal history. After the State has adequately explained the reasons for its strikes, the burden shifts back to the defense to prove by the preponderance of the evidence, that the peremptory challenges were used for a discriminatory purpose. *Salazar v. State,* 795 S.W.2d 187, 193 (Tex.Cr.App.1990). No such evidence was presented. Point six is overruled.

The judgment of the trial court is **affirmed.**