**Jesse CHADDOCK, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 05–05–00609–CR.**

Court of Appeals of Texas,
Dallas.

Oct. 13, 2006.

Russ Henrichs, Dallas, for Appellant.

William T. (Bill) Hill, Jr., Criminal District Attorney, for State.

Before Justices FITZGERALD, FRANCIS, and LANG–MIERS.

## OPINION

Opinion by Justice FRANCIS.

Jesse Chaddock was charged with engaging in organized criminal activity by committing aggravated assault while acting as a member of a criminal street gang. A jury convicted him of the offense and assessed his punishment at nineteen years in prison and a $10,000 fine. In seven issues, appellant contends the evidence is legally insufficient to support the element that he acted as a member of a criminal street gang and the trial court erred in admitting certain evidence. We affirm.

In his first issue, appellant contends the evidence is legally insufficient to support the jury's verdict because it does not establish that he was acting as a member of a criminal street gang when he committed the offense. Rather, appellant contends

the offense was a single criminal act he perpetrated individually.

In reviewing a challenge to the legal sufficiency of the evidence, we examine the evidence in the light most favorable to the judgment and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Sanders v. State*, 119 S.W.3d 818, 820 (Tex.Crim.App.2003). We are mindful that the jury exclusively judges the credibility and weight of testimony. *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996). The jury may draw reasonable inferences from basic to ultimate facts. *Sanders*, 119 S.W.3d at 820. Although appellant contests the admissibility of some of the evidence, we must consider all the evidence in conducting our review, whether properly or improperly admitted. *Moff v. State*, 131 S.W.3d 485, 488 (Tex.Crim.App.2004).

"A person commits an offense, if … as a member of a criminal street gang, he commits or conspires to commit … aggravated assault." Tex. Pen.Code Ann. § 71.02(a) (Vernon Supp.2006). A "criminal street gang" is "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." Tex. Pen. Code Ann. § 71.01(d) (Vernon 2003).

Viewed in the light most favorable to the jury's verdict, the evidence shows appellant is a member of the Confederate Hammerskins (CH), a racist skinhead gang. CH members are notorious for engaging in overwhelming, brutal beatings of ethnic minority group members, members of non-racist skinhead gangs, and random victims. CH members typically sport a number of racist tattoos, including a distinctive design featuring crossed hammers superimposed upon a Confederate battle flag.

Appellant is a follower and close friend of CH's co-founder and leader, Sean Tarrant. Appellant's body is covered in racist gang tattoos including a prominent crossed hammers tattoo on his abdomen. Appellant joined CH in 1996 after leaving another racist gang.

In 1996, the year he made "varsity," or joined CH, appellant and several others beat a Hispanic man. Appellant then stabbed an African–American security guard who attempted to aid the victim. Between September 16, 2000 and June 2, 2004, appellant assaulted four men and threatened two others. In each incident, appellant was accompanied by fellow skinhead gang members, sometimes including Tarrant and Judd Horn. Appellant's victims included non-racist skinheads, a "rock-a-billy" unaffiliated with any skinhead group, and a club deejay whom appellant discovered leaning against his car. In 2001 and 2002, appellant was overheard identifying himself as "Hammerskins Chaddock." Appellant was seen wearing a CH T-shirt in October 2003. While threatening one man, appellant lifted his shirt to display his crossed hammers tattoo and asked the victim if the victim knew what the tattoo meant.

The current offense occurred on the night of July 25, 2004. The complainant, his two daughters, and one daughter's friend attended a concert at the Gypsy Tea Room nightclub. Appellant also attended the concert with three to five associates including Horn, Terry Shanks, and Tarrant. Appellant and Tarrant attended the concert for free as guests of club employee Scott Beggs. Edward Whitt, head of security at the nightclub on the night of the offense, testified that appellant had been to the Gypsy Tea Room before and was frequently accompanied by Tarrant and

Horn on his visits. Appellant and the others in his group were wearing black T-shirts and displayed visible tattoos on their arms. Appellant's head was either shaved or close-cropped.

After the concert, as the crowd was leaving, the complainant reproached appellant's group after observing either appellant or Shanks flick a cigarette butt at an African–American patron. Appellant then stepped forward and began exchanging words with the complainant. The complainant attempted to move away, but appellant and his associates crowded around the complainant. Without warning, appellant hit the complainant with either his fist or a beer bottle. Appellant tackled the complainant, causing the complainant to strike his head on the concrete floor and lose consciousness. Appellant then straddled the complainant and repeatedly struck him with appellant's fist and slammed his head against the floor. Appellant also may have kicked or stomped on the complainant once. Appellant's companions crowded around, standing shoulder-to-shoulder, blocking the scene. When the complainant's daughter tried to push through, someone grabbed her shirt and pulled her back.

After the complainant's daughter was able to intervene, appellant's associates pulled him away and asked him to leave before the police arrived. Horn returned briefly to taunt the complainant, "I told you not to f—— around, Cowboy. That's what you get." When Whitt arrived at the scene, he asked Horn who had hit the complainant. Horn replied, "nobody."

As Whitt pushed people through the door, he saw appellant, with clenched fists, an angry demeanor, and blood on his forehead, attempting to reenter the club. Horn picked appellant up and carried him away from the club. After consulting with Tarrant and others, on July 31, 2004, appellant fled to California where he was harbored by Matt Meikle, a singer for a "white power" band. Appellant was ultimately arrested in California.

Appellant broke the complainant's neck in several places. Although initially diagnosed as a quadriplegic, the complainant had regained partial use of his limbs by the time of trial. The complainant's neurologist testified the complainant would never fully recover and he would experience pain and muscle spasms for life.

■ Truly Holmes, a detective with the Criminal Intelligence Division of the Dallas Police Department, testified as an expert on skinhead gangs. During the late 1980s, Holmes served as lead detective investigating skinhead-related criminal activity in the Deep Ellum and lower Greenville areas of Dallas. At that time, CH enjoyed a high profile. Subsequently, due to aggressive law enforcement and aggressive prosecution, including the prosecution and imprisonment of Tarrant, CH "went underground" and adopted a lower profile.

Holmes told the jury the current offense was a "classic type of assault by a Confederate Hammerskin." Holmes stated appellant's association with known gang members, his skinhead tattoos, and his behavior mark him as a current CH member. In formulating his opinion, Holmes relied on police and prosecutor reports, witness interviews, phone records, a radio interview of Tarrant, and his knowledge gleaned from past CH investigations. Holmes testified appellant's current association with Tarrant and with CH charter member Scott Lessig helped him identify appellant as an active member of CH. Holmes further stated Horn, who also has racist gang tattoos, is a CH member. Holmes agreed that fugitive Hammerskins sometimes went into hiding with Hammerskins in other parts of the country.

Appellant contends the State's evidence is legally insufficient because he introduced credible evidence that he and Tarrant had disassociated themselves from CH and renounced their racist views. Through cross-examination of the State's witnesses and his own testimony and that of his friends, appellant built a defense that his fight with the complainant was not gang-related, but rather a barroom brawl in which he interceded to help Shanks. Appellant testified at trial he had renounced racism and dropped out of CH in 2001 or 2002. Appellant's witnesses testified he had dated women with some ethnic minority blood and he had lived briefly with a Jewish couple. The defense testimony asserted Horn and Shanks had never been CH members. Two tattoo artists testified they were helping appellant cover up his racist, skinhead tattoos with non-offensive designs, he was no longer involved in skinhead groups, and it was common for former skinheads to want to cover up their gang tattoos. Whitt, who is Hispanic, acknowledged on cross-examination that appellant had always been friendly to him and to the Gypsy Tea Room's African–American bouncer. Appellant denied threatening the man who leaned on his car, and he explained the other incidents as fights arising from the personal animosity that many non-racist skinheads continued to harbor toward him because of his former association with CH. In addition to evidence showing appellant had assaulted people after his supposed conversion, the State also introduced evidence showing Tarrant had recently been interviewed on a racist internet radio program and Tarrant continued to play drums in a racist skinhead band.

The State's evidence shows appellant associated with at least two other skinheads in a gang with distinctive symbols, associated with an identifiable leader in Tarrant, and engaged in a pattern of assaultive behavior. From the evidence presented, the jury could reasonably conclude appellant committed aggravated assault as a member of a criminal street gang. Appellant's evidence does no more than challenge the credibility of the State's evidence, and the jury was free to reject appellant's evidence. *See Jones*, 944 S.W.2d at 647. We conclude the evidence is legally sufficient to support the jury's verdict. *Cf. Hernandez v. State*, 52 S.W.3d 268, 278 (Tex.App.-Corpus Christi 2001, no pet.) (upholding active gang member's conviction for engaging in organized criminal activity where gang had identifiable sign and leadership and engaged in drug transactions and murder). We overrule appellant's first issue.

■ In his second issue, appellant contends the trial court erred in permitting the State to "impeach" him during cross-examination with the record of his 1996 aggravated assault for which he successfully completed deferred adjudication community supervision. On appeal, appellant contends presentation of this evidence violated Texas Rule of Evidence 609(b).

The trial court did not admit evidence of appellant's deferred adjudication nor did the State request that this evidence be admitted. The State sought to question appellant about the facts of the 1996 incident, first, as rebuttal for appellant's testimony on direct examination that he was not the aggressor in offenses previously introduced by the State and, second, as part of its proof of the "continuing criminal activity part of the charge." At trial, appellant objected that this evidence was irrelevant in violation of Texas Rule of Evidence 401 and prejudicial in violation of rule 403. The trial court overruled the objection.

Texas Rule of Evidence 609 governs the use of prior convictions for impeachment.

*See* Tex.R. Evid. 609; *Juneau v. State*, 49 S.W.3d 387, 389–90 (Tex.App.-Fort Worth 2000, pet. ref'd) (limiting use of deferred adjudication status to certain grounds for impeachment). In this case, after a hearing held outside the jury's presence, the trial court allowed the State to offer evidence about the aggravated assault itself, but the State was not allowed to present evidence establishing appellant had been placed on deferred adjudication. Because no evidence was presented regarding appellant's deferred adjudication, rule 609 is inapplicable. Thus, we overrule appellant's second issue.

■ In his third and fourth issues, appellant contends the trial court erred in overruling his rule 403 objections and admitting evidence of the 1996 aggravated assault offense as well as other extraneous offenses. We review the trial court's determination to admit evidence under an abuse of discretion standard. *See Moses v. State*, 105 S.W.3d 622, 627 (Tex.Crim. App.2003). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g).

■ Evidence is relevant if it has any tendency to make more probable or less probable the existence of a consequential fact. *See* Tex.R. Evid. 401. Not all relevant evidence is admissible. *Moses*, 105 S.W.3d at 626. Evidence of extraneous offenses is not admissible as character evidence. *See* Tex.R. Evid. 404(b). Such evidence may be admissible, however, if the evidence has relevance other than to show character conformity. *Moses*, 105 S.W.3d at 626. Examples within the rules of evidence include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Tex.R. Evid. 404(b). Even rele-

vant evidence offered for a permissible purpose under rule 404(b) may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403; *Moses*, 105 S.W.3d at 626. In determining whether the danger of unfair prejudice outweighs the probative value of the evidence of an extraneous offense, we consider (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable; (2) the potential of the evidence to impress the jury in an irrational but indelible way; (3) the time needed to develop the evidence; and (4) the force of the proponent's need for the evidence. *See Mozon v. State*, 991 S.W.2d 841, 847 (Tex.Crim.App.1999).

■ Appellant contends the trial court erred in allowing testimony regarding the 1996 aggravated assault because the probative value of the evidence was substantially outweighed by its prejudicial effect in violation of rule 403. Appellant argues the State introduced evidence of the 1996 aggravated assault solely to show his propensity to commit crimes or bad acts, the offense was dissimilar because it involved a knife, it was too remote to prove motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident, and no proof establishes the offense was gang-related. Thus, appellant concludes, the probative value of the evidence was substantially outweighed by its prejudicial and inflammatory nature. *See* Tex.R. Evid. 403.

To carry its burden of proving appellant's participation in a criminal street gang, the State was required to show appellant and his companions "continuously or regularly associate in the commission of criminal activities." Tex. Pen.Code Ann. § 71.01(d). Thus, some evidence of extraneous offenses would be relevant and, indeed, essential to meet the State's burden

of proof. *See Hernandez,* 52 S.W.3d at 282; *cf. Canales v. State,* 98 S.W.3d 690, 697 (Tex.Crim.App.2003) (concluding evidence of gang's criminal activities was not extraneous to charged offense of committing prison murder as part of combination because evidence proved combination element of offense).

During trial, Detective Holmes described CH assaults as frequently involving groups of members surrounding, beating, and kicking victims in racially-motivated attacks. Thus, evidence showing appellant stabbed an African–American security guard who interfered when appellant and several other men were beating a Hispanic man is both relevant and highly probative. We cannot agree with appellant that such evidence was introduced solely to prove character conformity. Although appellant correctly observes a knife was used in the 1996 aggravated assault, there was evidence the stabbing took place only after appellant and his companions had engaged in a classic CH gang attack on the Hispanic victim.

■ We must further disagree that the 1996 attack is not probative of appellant's intent, preparation, and plan regarding the assault of the complainant. The 1996 aggravated assault is the first of a string of offenses in which appellant, supported by fellow gang members, assaulted persons who were either ethnic minority group members or persons who evinced non-racist behavior at odds with appellant's beliefs. Evidence of a string of similar, gang-related offenses makes it more probable that the latest of such offenses was also gang-related. *See Prince v. State,* 192 S.W.3d 49, 56 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd) (evidence of other robberies made intent to commit robbery more probable); *see also Canales,* 98 S.W.3d at 697. The trial court gave the jury a limiting instruction regarding the purposes of the evidence, thus minimizing the potential for improper influence on the jury. *See Lane v. State,* 933 S.W.2d 504, 520 (Tex.Crim.App.1996); *Prince,* 192 S.W.3d at 56. It took little time for the State to introduce the evidence. The State did develop the facts of the offense in detail, but that evidence was admitted through cross-examination of appellant and the victim's rebuttal testimony in an effort to counter appellant's own testimony explaining and minimizing the 1996 incident. We conclude that the trial court's determination to admit into evidence testimony regarding appellant's 1996 aggravated assault offense does not lie outside the zone of reasonable disagreement. *See Montgomery,* 810 S.W.2d at 391.

■ Appellant further contends the trial court erred when it permitted the State to introduce evidence of appellant's extraneous assaults and threats involving six other victims because the prejudicial effect of the evidence outweighed any probative value. Again, we disagree.

On direct examination, Holmes identified interviews with witnesses as a basis for his opinion of appellant's current gang membership. While cross-examining Holmes, defense counsel opened the door to further information about those witnesses by insinuating the witnesses had not corroborated the view that appellant was a current gang member and that Holmes ignored evidence contrary to his preconceived view of appellant's gang membership. On redirect examination, the State brought out, over appellant's objection, that he had assaulted four men and threatened two others between September 16, 2000 and June 26, 2004. One victim was African–American and several others were non-racist skinheads. Holmes opined that all of the assaults and threats were gang-related.

Appellant admitted that some of the victims were current gang members, but he denied that any of the incidents were gang-related. Rather, appellant characterized the assaults as fights arising out of personal conflicts. The State, in turn, called some of the victims and one eyewitness to rebut appellant's characterizations. Several victims described the presence of other CH members at the time of appellant's offenses, and one described appellant's assault against him as retaliation for a fight he had with Tarrant.

The jury was charged that it could consider the extraneous offense evidence "in determining the defendant's intent, motive, or membership in a criminal street gang, and for no other purpose." Through his testimony and the testimony of other defense witnesses, appellant disputed whether he was actively involved in CH. The extraneous offense evidence was relevant and probative because it established appellant associated with Tarrant and others in a criminal street gang. It also made it significantly more probable that appellant's aggravated assault upon the complainant was a gang-related criminal activity rather than a bar fight.

In contrast, we do not view the extraneous offense evidence as unduly prejudicial. Although the evidence was prejudicial to appellant in that it rebutted the defense effort to portray him as reformed, the jury had already heard graphic testimony from numerous witnesses about the assault of the complainant, providing ample proof of appellant's propensity for brutal behavior. Although appellant contends the extraneous offense evidence took a long time to present, it was presented in rebuttal of defense cross-examination and testimony. Because the evidence was highly probative and only marginally prejudicial, we cannot conclude the trial court abused its discretion in admitting evidence of the extrane-ous offenses. *See Mozon*, 991 S.W.2d at 847; *see also Prince*, 192 S.W.3d at 56 (evidence of similar robberies admitted in defendant's murder trial as probative of intent and scheme of robbing convenience stores). We overrule appellant's third and fourth issues.

■ In his fifth issue, appellant contends the trial court erred in permitting the State to introduce State's exhibit 75 into evidence because its probative value was substantially outweighed by the danger of unfair prejudice. Exhibit 75 is a transcript of a December 12, 2003 telephone interview Tarrant gave to Byron Calvert for broadcast on "Panzerfaughst Internet Radio 88." The State offered exhibit 75 into evidence, over appellant's rule 403 objection, after appellant recalled Holmes to testify and sought to portray his information about CH and Tarrant as outdated.

At the start of the interview, Calvert describes Tarrant as "one of the most respected White Power Skinheads in America. He is a drummer for Bully Boys, one of the most popular bands in the world and the founding member of Hammerskin Nation, which has chapters all over the world." During the interview, Calvert and Tarrant reviewed Tarrant's history of involvement with the skinhead movement, discussed his time in prison, and criticized a fellow skinhead who testified against Tarrant at trial. Tarrant admitted he was "still a skinhead" and opined that for members, "once a Skinhead always a Skinhead." Although he continued to embrace skinhead beliefs, Tarrant stated he had outgrown the extreme skinhead appearance and preferred to keep a lower profile so he could blend into the mainstream population because, "the less people know about you the better off you are." Both Calvert and Tarrant advised their listeners to avoid obvious tattoos and not to commit

felony hate crimes. Slurs against African–Americans and homosexuals were sprinkled throughout the interview.

Appellant concedes the State introduced exhibit 75 to prove Tarrant's continuing involvement with CH and to rebut appellant's testimony that Tarrant was no longer an active CH member. Appellant contends that in addition to these aspects, however, the exhibit is objectionable because the participants, especially Calvert, use "extremely prejudicial and socially unacceptable language," disparage the criminal justice system, and discuss how the movement should deal with an informant. Appellant contends that although Tarrant was present in the Gypsy Tea Room on the night of the offense, he did not participate in the alleged assault against the complainant, and he did not conspire with appellant. Thus, appellant concludes, any probative value the interview may have is substantially outweighed by its prejudicial effect.

The interview is probative because it supports Holmes's opinion about appellant's current gang membership, undermines appellant's credibility by disputing his testimony about Tarrant's current views, and suggests that his efforts to cover his tattoos and verbally disassociate himself from CH might be a subterfuge. Tarrant's continued involvement and leadership in CH is relevant because his presence at the scene of the offense with appellant makes it significantly more probable that appellant is an active gang member and the assault of the complainant was a gang activity. Although Tarrant did not assault the complainant directly, one need not perform a criminal act to engage in organized criminal activity. *See Nguyen v. State,* 1 S.W.3d 694, 697 (Tex.Crim.App. 1999) (explaining proof needed to establish existence of a "combination" under statute). An agreement to perform a common project may be inferred when each group member's action is consistent with realizing the common goal. *Nethery v. State,* 29 S.W.3d 178, 184 (Tex.App.-Dallas 2000, pet. ref'd); *see also Mayfield v. State,* 906 S.W.2d 46, 52 (Tex.App.-Tyler 1995, pet. ref'd) (trial court did not err in admitting evidence of co-conspirators' acts to prove defendant drug seller engaged in organized criminal activity). Members of appellant's group, including Tarrant, collaborated in the assault by providing appellant with backup, crowding around the combatants, pulling appellant away so he would not be apprehended, returning to taunt the complainant, lying to Whitt about appellant's involvement, and advising appellant after the offense.

During a pretrial hearing addressing the admissibility of evidence involving Tarrant, defense counsel conceded that, "[i]f we want to talk about Sean Tarrant putting a group together or even being the leader in the group, I believe that would be relevant to proving street gang issues...." Whitt testified he approached Tarrant and asked him to tell Shanks to stop pinching female patrons. When asked on cross-examination why he thought Shanks would obey Tarrant, Whitt opined, that Shanks "would do what Sean tells him to." When asked the basis for his opinion, Whitt replied, "[b]ecause I know." After finding out about the fight and learning appellant was involved, Beggs called Tarrant, before he called appellant, to find out what happened. Thus, we conclude that evidence showing Tarrant is involved in CH is relevant and highly probative. Although we agree with appellant that the evidence is prejudicial, in light of its probative value and appellant's opening the door by recalling Holmes and casting doubt upon Holmes's testimony, we cannot conclude that the trial court's decision to admit State's exhibit 75 lies outside the zone of reasonable disagreement. *See Brosky v. State,* 915 S.W.2d 120, 134–35 (Tex.App.-

Fort Worth 1996, pet. ref'd) (no error in admitting racist propaganda as evidence that murder was committed by combination animated by white supremacist beliefs). We overrule appellant's fifth issue.

■ In his sixth issue, appellant contends the trial court erred in admitting State's exhibit 75 because the interview constituted inadmissible hearsay. Before the trial court, the State argued Tarrant's comments were admissible as statements against interest while Calvert's statements were not offered for the truth of the matters discussed therein, but rather to put Tarrant's and Calvert's comments into context.

Appellant contends the prosecutor's explanation is belied by his comments during final argument when he brought up the interview. Appellant further contends the interview is objectionable for both Tarrant's and Calvert's comments.

■ The State responds the interview was not offered for the truth of the matters asserted. Rather, the State contends Tarrant's interview demonstrated he still harbored racist views and identified with the skinhead ideology. The State again argues Calvert's remarks were offered merely for context. The State further contends the transcript is admissible as a statement against interest and as evidence underlying Holmes's expert opinion. We review for an abuse of discretion the trial court's determination to admit the exhibit over appellant's hearsay objection. *Coffin v. State*, 885 S.W.2d 140, 149 (Tex.Crim. App.1994).

Appellant first contends the prosecutor's statement to the trial court that the transcript was not offered for the truth of the matter asserted is belied by the prosecutor's final argument wherein the State used Tarrant's appearance on Panzerfaughst to challenge appellant's credibility:

And their final attempt that we know, the leader, the general, he gave it up before I did. Old Sean, he is not a Hammerskin anymore. Well, we are just trying to prejudice you with this; right? It has got nothing [sic] do with this case. Old Sean gave it up back in 2000, 2001. He is not a Hammerskin anymore. I'm in a Panzerfaughst Internet Radio 88 interview. Now what is 88 again? Oh, that's the H, the eighth letter of the alphabet. Old Sean, who gave up the Hammerskins back in 2000. He is not being interviewed on the Disney Internet Channel. He's being interviewed on the Panzerfaughst Internet Radio. And it says this is Friday, December the 12th, 2003. You do the math. About seven months before this fellow here, the guy that made the varsity back in 1997, assaults [the complainant].

The prosecution's argument does not delve into the substance of the interview. Rather, it focuses on the implications and inferences that can be drawn from Tarrant giving an interview to an openly racist radio program. Thus, we cannot agree with appellant that the final argument shows exhibit 75 was admitted for the truth of the matters asserted therein.

Moreover, even if the interview's importance lies in the truth of the matters asserted therein, the hearsay rule excepts statements against interest which would tend to subject the declarant to hatred, ridicule, or disgrace such that a reasonable person would not make the statement unless the person believed it to be true. *See* TEX.R. EVID. 803(24). In the interview, Tarrant and Calvert lament that persons holding racist beliefs pay a heavy price for using racial epithets and expressing their beliefs. Appellant's brief describes the interview as containing "socially unacceptable language throughout." Accordingly,

we also agree with the State that the interview is admissible as a statement against interest. *Cf. Purtell v. State,* 761 S.W.2d 360, 369 (Tex.Crim.App.1988) (married minister's hearsay declaration that he engaged in homosexual act in public restroom admissible as statement against interest). We overrule appellant's sixth issue.

■ In his seventh issue, appellant contends the trial court erred in permitting the State to introduce State's exhibit 74 into evidence because the probative value of the exhibit was substantially outweighed by its prejudicial and inflammatory impact. The State admitted exhibit 74 into evidence while cross-examining defense witness Beggs, who had suggested on direct examination that Tarrant had abandoned the skinheads and his racist beliefs. State's exhibit 74 consists of the lyrics to two songs by the Bully Boys, a "white power" musical group featuring Lessig, a prominent CH member, as lead singer and Tarrant as drummer. The first song, "Jigrun," describes a group excitedly preparing to assault African–Americans. The second song, "Six Million More," advocates the mass extermination of Jews.

As the State points out, although appellant complains about the admission of the exhibit, his argument is directed only at "Six Million More" and does not address the merits of admitting "Jigrun" into evidence. Because the current case involves an aggravated assault arising, according to some witnesses, from the complainant's objecting to a provocative act directed at an African–American, we consider "Jigrun" to be highly probative of the mind set of Tarrant, the leader of CH. Because Holmes's opinion regarding appellant's membership in the CH is grounded partly on his continued association with Tarrant, evidence that reflects Tarrant's intent and motivation in gathering with his associates on the night of the offense is relevant to appellant's intent and motivation in assaulting the complainant. *See Brosky,* 915 S.W.2d at 135 (finding no error in admitting into evidence racist, skinhead song lyrics in murder prosecution because they helped demonstrate nature of combination skinhead defendant belonged to and motive for murder). Moreover, the fact that Beggs listens to such music, even in his professional capacity as a music promoter, damages his credibility. Although the lyrics of "Jigrun" are highly inflammatory and prejudicial, we conclude the probative value of the lyrics is sufficient to support the trial court's exercise of its discretion in admitting the lyrics into evidence.

■ With regard to "Six Million More," the lyrics are equally inflammatory and prejudicial as those of "Jigrun," but we conclude they have less probative value. There is no suggestion on the record that appellant's assault of the complainant was motivated by anti-Semitism and, unlike the protagonists of "Jigrun," "Six Million More" does not advocate individuals engaging in small-scale personal assaults against the targeted victims. Assuming these lyrics were not admissible, we conclude any error would be harmless.

■ We disregard nonconstitutional errors that do not affect appellant's substantial rights. *See* Tex.R.App. P. 44.2(b). We will not reverse for a nonconstitutional error if, after examining the record as a whole, we are fairly assured that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Garcia v. State,* 126 S.W.3d 921, 927 (Tex.Crim.App.2004). In determining the harm flowing from erroneously overruling a rule 403 objection, we consider the existence and strength of other evidence, the emphasis given to the erroneously admitted evidence, and any limiting instructions. *See Williams v. State,* 27

S.W.3d 599, 603 (Tex.App.-Waco 2000, pet. ref'd).

The State's evidence already included the lyrics to "Jigrun" and the lyrics to a third Bully Boys song, entitled "Hammerskins." The jury was aware appellant had Nazi symbols among his many tattoos, and the testimony, taken as a whole, amply demonstrates appellant's and Tarrant's animosity toward ethnic minorities. The State emphasized the lyrics to the other songs, especially "Hammerskins," which expressed the gang's violent ideology. We conclude the admission of "Six Million More" into evidence, even if erroneous, was harmless. *See Garcia,* 126 S.W.3d at 927. Therefore, we overrule appellant's seventh issue.

We affirm the trial court's judgment.