FILED IN
COURT OF CRIMINAL APPEALS

June 24, 2015

ABEL ACOSTA, CLERK

AP-77,036
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/24/2015 4:56:49 PM
Accepted 6/24/2015 5:00:42 PM
ABEL ACOSTA
CLERK

## No. AP-77,036

In the
Court of Criminal Appeals of Texas
At Austin

————◆————

**No. 1412826**
In the 179th District Court
Of Harris County, Texas

————◆————

**JUAN BALDERAS aka APACHE**
*Appellant*
v.
**THE STATE OF TEXAS**
*Appellee*

————◆————

State's Appellate Brief

————◆————

**Clinton A. Morgan**
Assistant District Attorney
Harris County, Texas
State Bar No. 24071454
morgan_clinton@dao.hctx.net

1201 Franklin St., Suite 600
Houston, Texas 77006
Telephone: 713.755.5826

**Devon Anderson**
District Attorney
Harris County, Texas

**Caroline Dozier**
**Traci Bennett**
**Mary McFaden**
Assistant District Attorneys
Harris County, Texas

Oral Argument Requested

## Statement Regarding Oral Argument

The appellant requested oral argument and so does the State.

## Identification of the Parties

Counsel for the State:

Devon Anderson
— District Attorney of Harris County

Caroline Dozier, Traci Bennett, & Mary McFaden
— Assistant District Attorneys at trial

Clinton A. Morgan
— Assistant District Attorney on appeal

Appellant:

Juan Balderas aka Apache

Counsel for the Appellant:

Jerome Godinich, Alvin Nunnery, Bob Scott & R. Scott Shearer
— Counsel at trial

R. Scott Shearer
— Counsel on appeal

Trial Judges:

Kristen M. Guiney & Doug Shaver
— Presiding judges

# Table of Contents

Statement Regarding Oral Argument ....................................................i

Identification of the Parties ............................................................i

Table of Contents ....................................................................... ii

Index of Authorities ....................................................................v

Statement of the Case ...................................................................1

Summary of the Facts ...................................................................1

Statement of Facts ......................................................................1

Summary of the Argument ..............................................................5

**Reply to Point One**

The evidence is sufficient to support the appellant's conviction. His only argument to the contrary is that one of the State's witnesses was not credible, but this Court does not reweigh the jury's credibility determinations on appeal.................................................................. 8

**Reply to Point Two**

The trial court did not err in denying the appellant's mid-trial motion to dismiss that was based upon a supposed speedy-trial violation.... 10

I.   Legal Background: *Barker*'s attempt to assess an "amorphous" right ................................................................................... 11

II.  Factual Background: Testimony at the hearing explaining the delay .................................................................................... 12

III. Argument: The appellant's right to a speedy trial was not violated because he did not assert it in a timely manner.................... 16

   A.   Length of the Delay................................................................. 17

   B.   Reason for the Delay ............................................................... 17

   C.   Defendant's Assertion of the Right........................................ 20

   D.   Prejudice .................................................................................. 22

   E.   Balancing the Factors ............................................................. 23

## Reply to Points Three, Four, Five, and Six

Point Three: The trial court did not violate the Sixth Amendment when it allowed Wendy to testify through an interpreter......................... 25

    I.    Factual Background: Wendy wanted to testify through an interpreter, but the appellant sought to cross-examine her in English.......................................................................................... 25

    II.    Argument: Allowing Wendy to testify through an interpreter did not violate the Sixth Amendment. ......................................... 27

        A.    Allowing a witness to testify through an interpreter does not implicate the right to confrontation.......................................... 28

        B.    Even if the use of interpreters implicates some of the concerns of the Sixth Amendment, the use of an interpreter here would still not be a constitutional violation because the Sixth Amendment is not absolute and the trial court's decision to use a translator was reasonable. ........................................................... 31

Point Five: The trial court did not violate state statutory law by allowing Wendy to testify through an interpreter....................................... 34

Point Four: The trial court did not abuse its discretion in refusing to admit an audio recording because it was improper impeachment on an uncontested matter. Moreover, because the audio recording was cumulative, any error in excluding it should not result in reversal..... 35

Point Six: The appellant's claim is that the trial court violated Rule 615 by not admitting the recording, but Rule 615 is a rule of discovery, not admissibility. The trial court's ruling on admissibility did not implicate Rule 615. ........................................................................................... 39

## Reply to Point Seven

The jurors were not unduly influenced when someone waived at them.............................................................................................................. 41

**Reply to Point Eight**

The photo lineup was not impermissibly suggestive ................................ 45

    I.    Factual Background ................................................................. 45

    II.   Legal Background .................................................................. 50

    III.  Argument ................................................................................ 52

        A.   The appellant did not "st[i]ck out like a sore thumb" in the photo lineup. ................................................................. 52

        B.   The totality of the circumstances does not show a substantial likelihood of misidentification ................................. 55

**Reply to Point Nine**

The jury's note to the trial court did not indicate a point of disagreement, therefore the trial court was correct in its decision not to have testimony read back in response to that note .............................. 58

Conclusion ...................................................................................... 63

Certificate of Compliance and Service .......................................... 64

Appendix: State's Exhibit 56

# Index of Authorities

**Cases**

*Anderson v. State*
  717 S.W.2d 622 (Tex. Crim. App. 1986) .......................................................... 39

*Balterierra v. State*
  586 S.W.2d 553 (Tex. Crim. App. 1979) .......................................................... 34

*Barker v. Wingo*
  407 U.S. 514 (1972) ......................................................... 11, 17, 18, 22

*Barley v. State*
  906 S.W.2d 27 (Tex. Crim. App. 1995) ............................................................. 51

*Cantu v. State*
  253 S.W.3d 273 (Tex. Crim. App. 2008) ........................................................... 11

*Clayton v. State*
  235 S.W.3d 772 (Tex. Crim. App. 2007) ............................................................. 8

*Cooks v. State*
  844 S.W.2d 697 (Tex. Crim. App. 1992) ........................................................... 51

*Crawford v. Washington*
  541 U.S. 36 (2004) ..................................................................................... 29

*Diaz v. State*
  491 S.W.2d 166 (Tex. Crim. App. 1973) ........................................................... 34

*Dragoo v. State*
  96 S.W.3d 308 (Tex. Crim. App. 2003) .......................................................17, 21

*Emery v. State*
  881 S.W.2d 702 (Tex. Crim. App. 1994) ........................................................... 16

*Garcia v.* State
  149 S.W.3d 135 (Tex. Crim. App. 2004) ........................................................... 26

*Gaskin v. State*
  353 S.W.2d 467 (Tex. Crim. App. 1961) ........................................................... 39

*Harris v. State*
  827 S.W.2d 949 (Tex. Crim. App. 1992) ..................................................17, 21, 51

*Haugh v. Jones & Laughlin Steel Corp.*
949 F.2d 914 (7th Cir. 1991) ....................................................................... 43

*Hernandez v. State*
986 S.W.2d 817 (Tex. App.—
Austin 1999, pet. ref'd) ................................................................................ 26

*Howell v. State*
175 S.W.3d 786 (Tex. Crim. App. 2005) ................................................... 60

*Janecka v. State*
937 S.W.2d 456 (Tex. Crim. App. 1996) ................................................... 20

*Loserth v. State*
963 S.W.2d 770 (Tex. Crim. App. 1998) ................................................... 52

*Martinez v. State*
91 S.W.3d 331 (Tex. Crim. App. 2002) ...................................................... 40

*Maryland v. Craig*
497 U.S. 836 (1990) ...................................................................................... 29

*McQuarrie v. State*
380 S.W.3d 145 (Tex. Crim. App. 2012) ................................................... 43

*Merritt v. State*
368 S.W.3d 516 (Tex. Crim. App. 2012) ...................................................... 8

*Moore v. State*
874 S.W.2d 671 (Tex. Crim. App. 1994) ................................................... 60

*Mosley v. State*
983 S.W.2d 249 (Tex. Crim. App. 1998) ................................................... 38

*Neil v. Biggers*
409 U.S. 188 (1972) ...................................................................................... 52

*Robison v. State*
888 S.W.2d 473 (Tex. Crim. App. 1994) ................................................... 61

*Romero v. State*
173 S.W.3d 502 (Tex. Crim. App. 2005) .............................................. 31, 32

*Shaw v. State*
117 S.W.3d 883(Tex. Crim. App. 2003) .................................................... 21

*Smith v. State*
  65 S.W.3d 332, 343 (Tex. App.—
  Waco 2001, no pet.) ........................................................................ 39

*State v. Munoz*
  991 S.W.2d 818 (Tex. Crim. App. 1999) ........................................ 23

*State v. Wei*
  447 S.W.3d 549 (Tex. App.—
  Houston [14th Dist.] 2014, pet. ref'd) .......................................... 17

*Stovall v. Denno*
  388 U.S. 293 (1967) ....................................................................... 51

*United States v. Carrion*
  488 F.2d 12 (1st Cir. 1973) ............................................................ 27

*Vermont v. Brillon*
  561 U.S. 81  (2009) ........................................................................ 19

*Weatherred v. State*
  15 S.W.3d 540 (Tex. Crim. App. 2000) .......................................... 57

*Webb v. State*
  760 S.W.2d 263 (Tex. Crim. App. 1988) ................................... 50, 51

*Willingham v. State*
  897 S.W.2d 351 (Tex. Crim. App. 1995) ........................................ 37

*Wyatt v. State*
  23 S.W.3d 18 (Tex. Crim. App. 2000) .............................................. 9

*Zamorano v. State*
  84 S.W.3d 643 (Tex. Crim. App. 2002) ...................................... 19, 22

## Statutes

18 U.S.C. § 1827 ................................................................................ 28

18 U.S.C. § 1828 ................................................................................ 28

TEX. CODE CRIM. PROC. art. 27.08 ..................................................... 10

TEX. CODE CRIM. PROC. art. 38.30 ................................................. 28, 34

## Constitutional Provisions

U. S. CONST. amend. VI ........................................................................ 11

## Rules

TEX. R. EVID. 611 ................................................................................. 35

TEX. R. EVID. 615 ................................................................................. 40

## Other Authorities

American Academy of Dermatology
  "Different Kinds of Birthmarks"
  https://www.aad.org/dermatology-a-to-z/for-kids/about-
  skin/birthmarks/different-kinds-of-birthmarks ...................................... 56

Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot
  1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE. § 607.1 (3d ed.
  2002) ................................................................................................. 38

## Statement of the Case

The appellant was indicted for capital murder. (CR 2). The appellant pleaded not guilty. (24 RR 15-16). A jury found him guilty as charged. (CR 3284, 3355). Based on the jury's findings regarding special issues that were submitted at the punishment phase, the trial court sentenced the appellant to death. (CR 3342-45, 3355). The trial court certified the appellant's right of appeal and the appellant filed a timely notice of appeal. (CR 3359, 3360).

## Summary of the Facts

The appellant murdered a fellow gang member for being insufficiently loyal to the gang.

## Statement of Facts

In 2003, the appellant started his own small chapter of the La Tercera Crips ("LTC") street gang. (26 RR 133-34). Soon thereafter, Eduardo Hernandez, then about 13-years old, began hanging around the gang. (26 RR 136-36). Eventually, with the appellant's sponsorship, Hernandez became a full member of the gang. (26 RR 137-38).

In December, 2004, fellow LTC member Israel Diaz stole a car at gunpoint and let Hernandez borrow it for a few days. (26 RR 140-41). When police stopped Hernandez and arrested him for driving the stolen car, he told them it was Diaz who had committed the carjacking. (26 RR 140-41). Diaz was eventually able to persuade Hernandez not to testify against him, but the incident caused other LTC members to start avoiding Hernandez. (26 RR 146).

Ostracized from his own gang, Hernandez began hanging out with individuals from other gangs. (26 RR 146-48). In late 2005, LTC members held a meeting regarding Hernandez. (26 RR 149). At the meeting, pictures were circulated that showed Hernandez hanging out with members of rival gangs and — even worse — flashing another gang's signs. (26 RR 149-52). The LTC members came to a consensus that someone needed to find Hernandez and kill him. (26 RR 152-53).

A few days later, on December 6, 2005, Hernandez was hanging out at an apartment on Corporate Drive with his girlfriend, Karen Bardales, her sister Wendy, and Wendy's boyfriend Edgar Ferrufino. (24 RR 44-45). That afternoon, an LTC member named Jose Vazquez dropped by and had a conversation with Hernandez that left Hernandez feeling worried. (24 RR 46-48; 27 RR 241-43). Vazquez left the

2

Corporate Drive apartment and placed a phone call to the appellant. (27 RR 10).

Hernandez, Ferrufino, and the Bardales sisters went out to another friends' house that evening. (24 RR 49-50). When they returned to the Corporate Drive apartment, there was some LTC graffiti spray-painted on the outside of the building. (24 RR 51-52; State's Ex. 41). Hernandez understood from this that "something was going to happen." (24 RR 53).

Ferrufino and Wendy had gone into the apartment first; Wendy sat on the couch and Ferrufino sat down in front of him. (24 RR 241, 243). When Hernandez and Karen came into the apartment, as soon as the door shut behind them someone fired a gun immediately outside the door. (24 RR 241-42). A gunman burst through the door and began shooting into the apartment. (24 RR 54). Hernandez and Karen fell to the ground, and the shooter began walking around the apartment, apparently searching for something. (24 RR 54-55, 248). The gunman walked up to where Hernandez was laying, shot him several times in the head, and then left. (24 RR 56-57, 248). Hernandez was shot at least nine times and died at the scene; no one else was injured. (24 RR 258; 27 RR 136, 172).

Shortly thereafter, word circulated among LTC members that Hernandez was dead. (26 RR 155-57). The gang met across the street from the Corporate Drive apartment and observed the emergency vehicles at the murder scene. (26 RR 158). The gang members saw the appellant lingering in the apartment complex near the scene. (26 RR 159). He crossed the street to join his gang members, and he joyfully hugged them all. (26 RR 159). As the appellant loaded a new magazine into his silver pistol, he said that he had "finally got him." (26 RR 160).

Of the witnesses to the murder, only Wendy Bardales got a good look at the gunman's face. (24 RR 60, 254; 27 RR 207, 229-30). A few days after the murder, police showed Wendy a photo lineup and asked if she recognized anyone; she identified one of the photos as being of Israel Diaz, but she said he was not the gunman. (27 RR 215, 220-21). A few days later, police showed Wendy another photo lineup and she immediately picked out a photo of the appellant and identified him as the gunman. (27 RR 226, 229-30).

Houston police obtained a pocket warrant for the appellant and went to arrest him on December 16, 2005. (25 RR 205-07; 27 RR 14-15). Police staked out an apartment where they believed the appellant to be, and eventually the appellant and an associate, Silder, came out. (25 RR

4

212). The appellant was carrying a large black bag and a green box, and Silder was carrying a long box. (25 RR 212). Police arrested both of them and discovered that the boxes and bag they were carrying contained numerous firearms, magazines, and rounds of ammunition. (25 RR 219-29; State's Exs. 64-75). One of the guns recovered was a silver .40-caliber Taurus pistol that forensic examination would later reveal was the gun used to kill Hernandez. (25 RR 236-39; 28 RR 37-40).

On appeal, the appellant raises no complaint regarding the punishment phase of trial. It is worth noting, though, that the State's extensive punishment-phase evidence showed that, between September and December 2005, the appellant committed three other murders and two aggravated assaults in which he shot people.

## Summary of the Argument

The appellant raises nine points of error. In his first point, he challenges the sufficiency of the evidence to support his conviction. His only argument, however, relates to the credibility of a State's witness and thus does not undermine the legal sufficiency of the State's evidence.

5

In his second point of error, the appellant claims that the trial court erred in denying his motion to dismiss based on a speedy trial violation. However, the fact that the appellant did not file his motion to dismiss until jury selection had begun — more than eight years after his arrest — shows that he acquiesced to the lengthy pre-trial delay and his right to a speedy trial was not violated.

In his third and fifth points the appellant complains that the trial court erred by allowing Wendy Bardales to testify through an interpreter. However, there is no authority — constitutional or statutory — limiting a trial court's discretion to appoint an interpreter for a witness who requests one.

On a related subject, the appellant's fourth and sixth points complain about the trial court's decision not to allow him to admit an audio recording of Wendy speaking English. However, the sole relevance of this evidence was to show that Wendy could speak English, and that point was not in dispute. Therefore, the evidence was improper impeachment and cumulative, therefore the trial court did not err in excluding it.

In his seventh point, the appellant argues that the trial court should have granted a mistrial after someone waved at the jurors as

they were leaving the courthouse. However, this wave conveyed no information to the jurors, meaning there is nothing in the record to suggest how or whether it exerted influence on the jury, thus this Court should reject this point.

In his eighth point of error the appellant complains that Wendy's identification of him as the shooter was tainted by an impermissibly suggestive photo lineup. However, the lineup was not impermissibly suggestive, and, considering the totality of the circumstances, there is no reason to believe the lineup created a substantial risk or misidentification.

In his ninth point, the appellant complains about the trial court's decision not to read back testimony to the jury in response to a jury note. However, that note did not specify that the jury had a dispute over the testimony and, at any rate, the testimony the appellant wanted to have read back was not responsive to the jury's note, thus the trial court did not abuse its discretion in not having the testimony read back.

## Reply to Point One

**The evidence is sufficient to support the appellant's conviction. His only argument to the contrary is that one of the State's witnesses was not credible, but this Court does not reweigh the jury's credibility determinations on appeal.**

In his first point of error, the appellant claims that the evidence is insufficient to support his conviction. The appellant's argument consists exclusively of questioning Wendy Bardales's identification of the appellant as the gunman. (*See* Appellant's Brief at 22-24). This argument repeats many of the themes of the appellant's guilt-phase jury argument. (*See* 30 RR 5-30).

When reviewing the sufficiency of the evidence, this Court considers all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). Because the Texas legal system assigns to the factfinder at trial the duty of resolving conflicting testimony, an appellate court conducting sufficiency review must defer to the jury's credibility determinations. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury may choose to believe some testimony

and disbelieve other testimony. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). When the record supports conflicting inferences, this Court presumes that the jury resolved the conflicts in favor of the verdict, and will defer to that determination. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014).

In this case, the appellant was charged with committing capital murder during the commission of a burglary. (CR 2). Wendy Bardales testified that as she sat on the floor of a friend's apartment, she observed the appellant break into the apartment, uninvited, and intentionally shoot Eduardo Hernandez in the head. (25 RR 182-86). She identified the appellant as the gunman to police officers during the investigation, and in the court room. (25 RR 194-97).

The State supposes that a jury could have disbelieved Wendy's identification because, as the appellant points out in his brief, she did not identify the appellant as the gunman until several days later. However, the jury found Wendy credible and this Court must defer to that determination. Viewing the evidence in the light most favorable to the verdict, the evidence in this case is sufficient.

**Reply to Point Two**

**The trial court did not err in denying the appellant's mid-trial motion to dismiss that was based upon a supposed speedy-trial violation.**

The appellant was arrested in December, 2005. Jury selection for his trial did not begin until January, 2014. On the fifth day of jury selection, the appellant filed a *pro se* "motion for speedy trial." (State's Ex. 5). The motion did not request any particular relief, but instead the prayer asked that the trial court "grant this Motion for Speedy Trail [*sic*] in all things sought therein." (State's Ex. 5). The trial court made no ruling on this motion and it is not mentioned in the docket.

On January 29, the eleventh day of jury selection, defense counsel filed a "Motion to Dismiss the Indictment for Lack of a Speedy Trial." (CR 3121). The subtitle of the motion invoked Code of Criminal Procedure Article 27.08, which relates to exceptions to the substance of an indictment. (CR 3121); *see* TEX. CODE CRIM. PROC. art. 27.08. On February 12 — after the jury had been selected but before it had been sworn — the trial court held a hearing on this motion and denied it. (22 RR 5-81). In his second point of error the appellant claims that trial court erred in denying the motion. (Appellant's Brief at 24-36).

## I. Legal Background: *Barker*'s attempt to assess an "amorphous" right

The Sixth Amendment to the federal constitution provides that defendants "shall enjoy the right to a speedy … trial." U. S. CONST. amend. VI. This right, though, is a difficult one to assess because, among other reasons, it is often the case that a criminal defendant would prefer not to go to trial, or at least to have his trial delayed. *Barker v. Wingo*, 407 U.S. 514, 520-23 (1972). In an effort to vindicate defendants' rights without allowing them to easily game the system, the Supreme Court in *Barker* established a now-familiar four-part test for assessing whether the pre-trial delay in a particular case has violated the Sixth Amendment's guarantee. *See Id*. at 530-32. In short, the four factors are: 1) whether the delay was long enough to trigger an inquiry; 2) what caused the delay; 3) whether the defendant timely asserted his right to a speedy trial; and 4) what harm was caused by the delay. *Ibid*.

On appeal, a trial court's ruling on a speedy-trial motion is reviewed for an abuse of discretion. *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008). Under this standard, the appellate court views all of the evidence in the light most favorable to the trial court's ruling. *Ibid*. Because the trial court made no findings of fact related to this

11

motion (nor did the appellant request any), this Court will presume that the trial court resolved all factual disputes in favor of the State and made all reasonable fact-findings required to support its decision. *Ibid.*

## II. Factual Background: Testimony at the hearing explaining the delay

At the hearing in this case, the State presented the testimony of Spence Graham and Paula Hartman, both of whom had been the chief prosecutor for the 179th District Court in years past and had worked on this case.

Graham became chief prosecutor of the 179th in May 2009, shortly after a new judge had been elected to the bench. (22 RR 28). At the time, more than a thousand cases were pending on the court's docket, with "almost 200" cases already set for trial. (22 RR 27-28, 34). At that point, the State's file for the appellant consisted of "approximately six to eight … banker boxes, full of offense reports and evidence …". (22 RR 9-10). The appellant's prosecution was part of a larger investigation into the La Tercera Crips, and at that time the State's file included "voluminous offense reports [of] 11 total homicides that … were linked in some way to [the appellant]." (22 RR 10).

When Graham took over the case, the State had not decided whether to seek the death penalty, so Graham sent defense counsel a "mitigation letter" asking for any mitigating evidence that might assist the State in making its decision. (22 RR 11). Defense counsel submitted the "mitigation packet" in late 2009 or early 2010. (22 RR 31). While the case was pending, and the appellant was making his regular court appearances, one of the appellant's lawyers was attempting to persuade the appellant to make a plea agreement in return for the State not seeking death. (22 RR 13-14). This defense attorney urged Graham not to present the case to the district attorney for a decision regarding the death penalty because "that would get the ball rolling and make it much more difficult for him to ever work this out [as a plea bargain]." (22 RR 16). Graham said that one of the appellant's other lawyers seemed resigned to the fact that this case would go to trial, but he never requested a trial date. (22 RR 16-17).

In April 2011, the State filed its notice of intent to seek the death penalty, and at that point Graham was ready to go to trial. (22 RR 19, 32). The case was set on the trial docket, with a pre-trial conference set for May 10, 2012, and a jury-trial setting for August 9, 2012. (22 RR 20).

At the hearing, the next witness was Paula Hartman, who became chief prosecutor of the 179th in January 2012. (22 RR 43). She said that when she took over, she began preparing for the August trial date. (22 RR 44-45). However, on May 10 defense counsel filed a motion for continuance asserting that the defense could not finish its investigation in time to go to trial in August. (State's Ex. 4). The trial court granted the motion, but noted on the order that it was "[g]ranted over strong opposition of the State." (State's Ex. 4). The case was reset for the following year, but in the meantime another judge — who would eventually be the trial judge in this case — was elected to the bench. (22 RR 49).

The appellant testified at the speedy-trial hearing. He explained that he had been in the county jail non-stop since his December 2005 arrest, and that this had caused various problems in his life: he had to call off his attempts to go to college and pursue a career in architectural drafting; he had to go to court once every month or so; he had lost contact with his "very Christian" relatives who "didn't want to come visit a[n] inmate accused of multiple capital murders"; and he had suffered "severe stress" and had considered killing himself. (22 RR 61-64). He said he had been in jail so long that the *Houston Chronicle* had written a

14

story about how long he had been in jail. (22 RR 64). Finally, the appellant said that one of his brothers had died and he had not been able to attend the funeral due to being in jail. (22 RR 63, 73). Though there is no assertion anywhere in the record that the brother was a witness to anything relevant to the trial, the appellant said that the brother would have testified had he not died. (22 RR 73).

On cross-examination, the prosecutor asked the appellant why he had filed a motion for speedy trial after trial had started. (22 RR 67). The appellant said this was due to "[l]ack of ignorance of legal system, not knowing procedure." (22 RR 67-68). He explained that he had become "educated" about speedy-trial law because of the article in the *Chronicle* about his situation. (22 RR 68). The prosecutor asked why he had not filed his motion until nine months after the *Chronicle* article was published, and the appellant explained that, due to some medication issues, he was "drowsy at times" during his regular visits to the jail's law library. (22 RR 68).

After testimony, defense counsel argued to the trial court that the length of the pre-trial delay was so egregious that it outweighed any other *Barker* factor, and asked the trial court to dismiss the case "as a matter of equity, as a matter of setting the standard here in Harris

15

County, and to prevent this kind of thing happening in the future." (22 RR 76-77). The State responded by looking at each of the *Barker* factors: 1) The delay was long enough to trigger an inquiry; 2) The delay was either caused by neutral causes (such as changes in the trial judge) or by delays from the defense; 3) The appellant never asserted his right to a speedy trial until after trial started; and 4) The appellant was not harmed, because the only supposed witness who was rendered unavailable by the delay was the appellant's brother, and there was no evidence suggesting what that brother could have testified about. (22 RR 77-79). The State cited to *Emery v. State*, 881 S.W.2d 702, 709 (Tex. Crim. App. 1994) for the proposition that an eight-and-a-half year delay in a capital case did not violate the Sixth Amendment if the prosecution was not responsible for the delay. (22 RR 78). The trial court denied the motion. (22 RR 80-81).

III.    **Argument: The appellant's right to a speedy trial was not violated because he did not assert it in a timely manner.**

The State will address all four of the *Barker* factors, but the deciding issue in addressing the appellant's claim is that he waited until trial proceedings had started before asserting his right to a speedy trial. Allowing a defendant who has waited in jail eight-and-a-half years

16

without complaint to file a speedy-trial claim in the middle of jury selection and win a dismissal would fly in the face of *Barker*'s admonitions against letting defendants game the system.

## A. Length of the Delay

The total delay between the appellant's arrest and the filing of his motion was 97 months, slightly more than eight years. This is long enough to trigger a speedy-trial inquiry. *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003) (one year sufficient to trigger inquiry).[1]

## B. Reason for the Delay

As one might expect with a 97-month delay, the causes of the delay in this case are numerous and complex. In a speedy-trial analysis, the key issue in assessing the cause of the delay is to look at the intentions of the State. *Barker*, 407 U.S. at 531. If the delay is caused by

---

[1] There are at present two lines of cases in Texas, one holding that a speedy-trial inquiry is triggered at the one-year point, the other holding that the inquiry is triggered after eight months. *See State v. Wei*, 447 S.W.3d 549, 554 (Tex. App.— Houston [14th Dist.] 2014, pet. ref'd) (citing *Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992) for eight-month threshold)). Neither of these lines of cases mention the other, and there are no consistent factual differences between them that would explain their coexistence. The State suggests that, since this is a matter of federal law and the Supreme Court has used the one-year threshold, the one-year threshold is a better statement of law. *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). At any rate, a brief statement from this Court clarifying the matter would be of assistance to the bench and bar.

actions that are intended to aid the truth-seeking function of trial, then the delay will not weigh in favor of dismissal. *Ibid.* If the delay is caused by things like ordinary docket backlog or general neglect by the State in pursuing a trial (causes that are generally referred to as "negligence"), the delay will weigh somewhat in favor of a dismissal, though not heavily. *Ibid.* And if the delay is due to an effort by the State to hinder the defendant's ability to mount a defense, the delay will weigh heavily in favor of dismissal. *Ibid.*

In this case, the record is largely silent as to what occurred between December 2005 and February 2009. At the hearing, the State admitted into evidence 36 reset forms with dates ranging from 2006 to 2013. (State's Ex. 1-2). Most of these resets give no reason for the reset, but a few provide evidence that the State was still deliberating whether to seek the death penalty. (*See* 46 RR 18 (case reset from October 3, 2007 to November 13, 2007, with note: "State to review case with Sgt. [illegible] and make a decision"), 19 (case reset from April 10, 2008 to May 1, 2008, with note: "Still waiting for pros to descide course of prosecution"), 47 (case reset from an illegible date to March 29, 2010, with note: "Waiting on word on mitigation packet")). To the degree this reflects an honest effort by the State to reach a just decision on whether

18

to seek death, and perhaps an effort to allow defense counsel to talk his client into striking a plea bargain to save his life, that portion of the delay does not weigh in favor of dismissal. *See State v. Munoz*, 991 S.W.2d 818, 824 (Tex. Crim. App. 1999) ("good faith plea negotiations is a valid reason for the delay and should not be weighed against the prosecution").

The appellant's 2012 continuance in this case should be factored into assessing the cause of any delay. While there are situations where a defendant can move for a continuance without it necessarily reflecting on his readiness for trial,[2] this was not one of those. The appellant's motion for continuance explicitly states that defense counsel was still investigating the case and was not prepared for trial. (State's Ex. 4). This motion was filed six years after the appellant's arrest. In light of this declaration that the appellant needed more than six years to gather evidence and mount a defense, the State suggests that none of the delay prior to the filing of this motion should weigh in favor of dismissal. *Vermont v. Brillon*, 561 U.S. 81, 92 (2009) (delay caused by defense

---

[2] *See Zamorano v. State*, 84 S.W.3d 643, 650 n.31 (Tex. Crim. App. 2002) (noting how "medical, personal, and professional problems or conflicts" might cause a defendant to announce "not ready" for particular trial dates, even though, generally speaking, defense was prepared for trial).

counsel's failure "to move the case forward" is not attributed to the state and weighs against finding a Sixth-Amendment violation). Indeed, depending on the nature of the defense investigation, it may well have been an abuse of discretion for the trial court to have forced a trial at any point earlier. *See Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996) ("Where denial of a continuance has resulted in demonstrated prejudice, we have not hesitated to declare an abuse of discretion.").

In sum, though there was more than eight years of delay in this case, there is no evidence that any of the delay was the result of any effort by the State to hinder the defense. The amount of delay attributable to "negligence" by the State in this case is negligible. Instead, the vast majority of the delay seems to have been used by the defense to assemble its case, thus this delay should not weigh in favor of finding a Sixth-Amendment violation.

## C. Defendant's Assertion of the Right

The definitive issue in this speedy-trial analysis is the appellant's untimely assertion of his right to a speedy trial. The lack of a timely demand for a speedy trial strongly indicates that a defendant did not

really want a speedy trial. *Dragoo*, 96 S.W.3d at 314. In this case, the appellant waited 97 months before filing his speedy-trial motions; delays far shorter than this have been held to be fatal to speedy-trial claims. *See ibid*. (41-month delay in asserting right "weighs very heavily against finding a violation of the speedy trial right"); *Shaw v. State*, 117 S.W.3d 883, 890 (Tex. Crim. App. 2003) (35-month delay in asserting right weighed "very heavily" against finding violation).

It is not only the length of time that passed before the appellant filed his motion that should weigh against him, it is the fact that he waited until after trial proceedings had started. The State can find no case involving a mid-trial speedy-trial motion, but day-of-trial and day-before-trial motions have been held to indicate that the defendant acquiesced to the delay and did not actually want a speedy trial. *Harris v. State*, 827 S.W.2d 949, 957 (Tex. Crim. App. 1992) (day-of-trial motion "indicates strongly that [defendant] did not really want a speedy trial"); *Dragoo*, 96 S.W.3d at 314-15 (rejecting speedy-trial claim filed the day before trial started). The presumption of acquiescence created by an untimely assertion of the right should be particularly strong in a capital case; a defendant looking at either a death sentence or a sentence of life-

21

without-parole may well have nothing whatsoever to lose from delay if he knows that the State's evidence is strong.

### D. Prejudice

In most cases, a defendant must show some sort of actual harm caused by the delay. *Barker* explained that the harm from delay will normally fall into one of three categories: 1) pretrial incarceration; 2) anxiety caused by pending charges; and 3) impairment of the defendant's ability to mount a defense. *Barker*, 407 U.S. at 532.

The State accepts that the appellant has shown some prejudice from the pre-trial delay. He spent the entire time incarcerated on this charge, and he testified that he suffered stress as a result of the pending charge. (22 RR 61-64); *see Zamorano*, 84 S.W.3d at 654 (stress from pending charges is "some evidence" of prejudice).

This "prejudice," though, takes on a somewhat different light in a capital context. A convicted capital defendant will be transferred either to a high-security prison or to death row; it is likely that the appellant will never again reside in a facility as pleasant as the Harris County jail. Had the appellant's trial occurred sooner, the result would have been to

reduce the prejudice of pre-trial incarceration by getting the appellant to death row sooner.

The appellant testified that his brother died during the pre-trial delay and that his brother would have testified for him. However, there is no evidence of what his brother would have testified about. Nothing at trial indicates that his brother had relevant evidence that the appellant was not able to procure elsewhere. The appellant made no other claim that his defense was hindered by the delay.

### E. Balancing the Factors

In a *Barker* analysis, no one factor should be controlling. *State v. Munoz*, 991 S.W.2d 818, 828 (Tex. Crim. App. 1999). In this case, the pre-trial delay was certainly lengthy, but the record shows that the appellant needed nearly all of that time in order to prepare his defense. The appellant's motion for continuance, filed more than 6 years after his arrest and indicating that he had not yet finished with pre-trial investigation, should serve to largely absolve the State from the responsibility for the early portion of the delay. Even once the defense team was ready for trial, though, the appellant did not file a motion for speedy trial until proceedings had begun, indicating that he acquiesced

to the delay and received a trial precisely when he wished to. Though the appellant was incarcerated during the entire delay, the fact that he used that time to assemble his defense and the fact that he exhibited no interest in a speedy trial should combine to show that his Sixth Amendment right to a speedy trial was not violated, and the trial court did not abuse its discretion in overruling the appellant's motion to dismiss. Thus, this Court should overrule his second point of error.

## Reply to Points Three, Four, Five, and Six

The appellant's third through sixth points all involve Wendy Bardales's ability, or lack thereof, to speak English, which the defense made a focus of the trial. The appellant's third and fifth points complain of the trial court's decision to allow Wendy to testify through an interpreter. The appellant's fourth and sixth points complain about what he claims were limitations placed on his ability to impeach Wendy regarding her ability to speak English.

**Point Three: The trial court did not violate the Sixth Amendment when it allowed Wendy to testify through an interpreter.**

    **I.    Factual Background: Wendy wanted to testify through an interpreter, but the appellant sought to cross-examine her in English.**

Wendy's testimony took place over two days, and both days she testified through an interpreter. (25 RR 33; 26 RR 10). Wendy explained that she was born in Honduras and did not begin learning English until she came to the United State at age 12; at the time of Hernandez's murder, she was 15. (25 RR 35). At trial, some eight years later, she requested to testify through an interpreter "to make sure [she] understood everything." (25 RR 35).

On the second day of her testimony, prior to beginning cross-examination, the appellant filed a "Motion to Compel Witness to Provide Cross-Examination Testimony in the English Language." (CR 3230-3233). In this motion, the appellant listed several facts tending to show that Wendy spoke English. He then asserted that "the State is using the interpreter as a shield to prevent the jury from noticing her deception and lies. The interpreter is completely unnecessary." (CR 3232). The appellant objected to Wendy's use of a translator because he believed it hindered his ability to cross examine her: "The jury cannot notice or

detect the witness'[s] voice inflection, facial expressions, speech patterns, etc. when the jury speaks English and the witness testifies in Spanish through an interpreter." (CR 3232). The appellant alleged that this violated his "right to confront witnesses, [his] right to cross-examinations, and [his] right to due process of law." (CR 3232).

The trial court held a brief hearing on this motion. (26 RR 5-10). The appellant offered as an exhibit a short recording that police had made of their discussion (in English) with Wendy back in 2005. (Def.'s Ex. 3). At the hearing, defense counsel accused the State of "improperly using the interpreter as a shield to shield Ms. Bardaeles'[s] testimony so that the jury can't see that she is, in fact, not being truthful." (26 RR 6).

In response, the State noted that the only law cited by the appellant dealt with situations where the question was whether a trial court was *required* to appoint an interpreter. (26 RR 6). The State cited to *Hernandez v. State*, 986 S.W.2d 817 (Tex. App.—Austin 1999, pet. ref'd) and *Garcia v.* State, 149 S.W.3d 135 (Tex. Crim. App. 2004) for the proposition that that if there is a chance a defendant might not fully understand English, the "best practice is to err on the side of caution" and appoint an interpreter. (26 RR 7-8). The prosecutor said that she could find no caselaw applying the same principle to witnesses, but also

26

noted that she could think of no reason why the same rule would not apply. (26 RR 7). The prosecutor noted that Wendy had said she still speaks Spanish in her home, and urged the court to "err on the side of caution" and allow Wendy to continue testifying through an interpreter. (26 RR 9).

The trial court noted that in listening to Bardeles speak at a hearing the prior day it had noticed "an inherent language barrier." (26 RR 9-10). The trial court stated its "belief that the jury will get a ... more accurate view of Ms. Bardeles'[s] testimony if allowed through a translator. So the motion is overruled." (26 RR 10).

## II. Argument: Allowing Wendy to testify through an interpreter did not violate the Sixth Amendment.

In his third point, the appellant claims that allowing Wendy to testify through an interpreter violated his Sixth Amendment right to confrontation. (Appellant's Brief at 37-59). This is a novel claim. There are numerous cases that stand for the proposition that the Sixth Amendment right to confrontation requires that the trial court appoint an interpreter for a non-English-speaking defendant. *See, e.g., United States v. Carrion*, 488 F.2d 12, 14 (1st Cir. 1973). ("Clearly, the right to confront witnesses would be meaningless if the accused could not

27

understand their testimony, and the effectiveness of cross-examination would be severely hampered."). There are statutes — both state and federal — regulating the appointment of interpreters for defendants and witnesses, and establishing guidelines for trial courts. *See* TEX. CODE CRIM. PROC. art. 38.30; 18 U.S.C. § 1827, 1828. However, the State can find no authorities discussing when, if ever, the appointment of an interpreter violates a defendant's right to confrontation; the appellant has cited to no on-point authority and presents his argument only by way of analogy.

The State's response to this argument is two-fold. First, the use of an interpreter does not implicate any of the essential elements that constitute the right of confrontation. Second, even if the use of an interpreter did implicate the right of confrontation, this Court would still need to defer to the trial court's findings that an interpreter was appropriate in this trial.

### A. Allowing a witness to testify through an interpreter does not implicate the right to confrontation.

First, it is worth noting that the appellant's point effectively challenges the use, under any circumstances, of an interpreter in a criminal trial. The appellant phrases his point such that he seems to

challenge the use of an interpreter only where the witness can speak English. But the problems he describes with the use of interpreters are not limited to those circumstances. If using an interpreter conceals a witness's demeanor such that it effectively prevents cross-examination, it does so regardless of whether the witness can speak English.

If the use of interpreters so impedes a defendant's ability to confront witnesses that it violated the Sixth Amendment, this would have the effect of prohibiting non-English speakers from testifying for the prosecution in criminal cases. The State is aware of no authority suggesting that this is the purpose of the Sixth Amendment. *See Crawford v. Washington*, 541 U.S. 36, 43-50 (2004) (discussing development of English and colonial American law prior to adoption of the Sixth Amendment, and concluding that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused").

In *Maryland v. Craig*, 497 U.S. 836 (1990), the Supreme Court analyzed the right of confrontation as comprising four elements: "physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." *Craig*, 497 U.S. at 846. None of these

elements are seriously implicated by the use of interpreters: the witness is still physically present, under oath, subject to cross-examination, and can be observed by the trier of fact.

The appellant claims that by speaking Spanish Wendy was able to conceal from the jury her "voice inflection, facial expressions, speech patterns, etc." (Appellant's Brief at 49), but that is incorrect. The jury could see and hear Wendy speak just as they could any other witness, only her words were in Spanish. Moreover, the appellant's point begs the question by assuming that her "voice inflections, facial expressions, speech patterns, etc." would have been accurately conveyed had she been forced to testify in English, her second language. If one objective of cross-examination is to get a gauge of the witness's demeanor, surely that demeanor is at least as well-conveyed by testimony in a native language as it would be by testimony in a language in which the witness must spend time mentally translating.[3]

---

[3] Wendy testified that she thinks in Spanish, thus to speak in English she needed to do her own translation, which sometimes meant she was not able to express herself well in English. (25 RR 200).

**B. Even if the use of interpreters implicates some of the concerns of the Sixth Amendment, the use of an interpreter here would still not be a constitutional violation because the Sixth Amendment is not absolute and the trial court's decision to use a translator was reasonable.**

Even if the use of an interpreter implicated an element of the confrontation right, that does not mean that using an interpreter necessarily violates the confrontation right. In *Romero v. State*, 173 S.W.3d 502 (Tex. Crim. App. 2005), this Court was faced with a situation where a witness testified while wearing sunglasses and a disguise that concealed his "mouth, jaw, and the lower half of his nose. *Romero*, 173 S.W.3d at 503. This Court held that this implicated two of the elements of confrontation. First, by obscuring the witness's eyes, the physical presence element was compromised because the defendant was not able to look the witness in the eye. *Id*. at 505. Second, because most of the witness's face was concealed the observation-of-the-witness's-demeanor element was compromised. *Id*. at 505-06. This Court held that the defendant's confrontation right was violated because two elements of that right had been compromised but there was no compelling reason to justify those compromises. *Id*. at 506.

31

Here, the appellant alleges that allowing Wendy to testify through an interpreter compromised the fact finder's ability to view her demeanor. Assuming that this is true, as this Court recognized in *Romero* the confrontation right is not absolute. *Id*. at 505 (recognizing *Craig*'s holding that an "important" interest could justify the complete denial of the physical-presence element). Indeed, the element that may have been compromised in this case — the viewing of the witness's demeanor — is the subject of the longest-standing and most well-known exception to the confrontation right: the admission of former testimony of an unavailable witness. *See generally Mattox v. United States*, 156 U.S. 237 (1895) (admission of deceased witness's testimony from prior trial did not violate Sixth Amendment). In cases like that, where testimony is read back to the jury from a transcript, the fact finder has no ability whatsoever to view the witness's demeanor, thus it cannot be that slight abrogation of the fact finder's ability to view the witness's demeanor (which is what the appellant alleges in this case) necessarily violates the right of confrontation.

As *Craig* and *Romero* accepted, elements of the confrontation right can be compromised if there is a sufficiently good reason for doing so. In this case, Wendy said that she was not sufficiently comfortable in

32

English to testify without an interpreter. Moreover, the trial court personally interacted with Wendy and came away with the impression that her testimony would be more accurate if Wendy testified through an interpreter. If using an interpreter is enough to implicate the right of confrontation, it must surely be the case that the trial court's determination that an interpreter is necessary to get accurate and useful testimony from a witness would be a sufficient justification for the slight abrogation of that right.

Both at trial and on appeal the appellant has pointed to evidence in the record showing that Wendy had some ability to speak English. The State does not dispute that evidence, but that does not mean that the trial court was incorrect in believing other evidence — including its own personal interactions with Wendy — over the evidence cited by the appellant. And it would be inappropriate for this Court, after viewing the cold record, to decide that the trial court was incorrect on a question for which there is conflicting evidence.

This Court should overrule the appellant's third point because there is no authority for the proposition that using an interpreter violates the Sixth Amendment, and it would be bad policy if this Court were to create such authority. Even if using an interpreter implicates an

element of the confrontation right, the abrogation of that element is so minor, and the importance of getting accurate testimony from witnesses so important, that this does not constitute a violation of the appellant's right of confrontation.

**Point Five: The trial court did not violate state statutory law by allowing Wendy to testify through an interpreter.**

In his fifth point, the appellant claims that the trial court abused its discretion and violated Code of Criminal Procedure Article 38.30 by allowing Wendy to testify through an interpreter. (Appellant's Brief at 68-70). However, the appellant does not cite any case that supports the proposition that a trial court can err by appointing an interpreter; all of his cases deal only with the question of whether trial courts abused their discretion in situations where they did *not* appoint interpreters. (*See* Appellant's Brief at 68, 70 (citing *Balterierra v. State*, 586 S.W.2d 553 (Tex. Crim. App. 1979) and *Diaz v. State*, 491 S.W.2d 166 (Tex. Crim. App. 1973)).

Article 38.30 sets guidelines for when a court *must* appoint an interpreter, but there is no state law establishing guidelines for when a court is prohibited from appointing an interpreter. *See* TEX. CODE CRIM. PROC. art. 38.30. The State submits that, aside from situations where a

34

trial court *must* appoint an interpreter, a trial court's decision to use an interpreter is strictly a matter of discretion in how a trial court manages a trial,[4] and there is little role for an appellate court to second guess that decision.

Even if this Court were to second guess the trial court's decision, the evidence of Wendy's English language skills was mixed: She seemed capable of speaking English, but she said she was more comfortable in Spanish, she spoke Spanish in her home, and the trial court found her English phrases to be awkward. On such a fact-intensive question, this Court should defer to the determination of the trial court and reject the appellant's fifth point.

**Point Four: The trial court did not abuse its discretion in refusing to admit an audio recording because it was improper impeachment on an uncontested matter. Moreover, because the audio recording was cumulative, any error in excluding it should not result in reversal.**

In his fourth point, the appellant purports to ask the question of whether a defendant has a right to cross-examine and impeach a witness "concerning her ability to speak English so that the jury might

---

[4] Rule of Evidence 611 imposes on the trial court the obligation to "exercise reasonable control over the mode and order of interrogating witnesses … so as to … make the interrogation and presentation effective for the ascertainment of the truth …." TEX. R. EVID. 611(a).

be made aware of her attempt to mask the extent of her fluency?" (Appellant's Brief at 59). However, that is not the substance of the appellant's point. The only adverse ruling that the appellant raises in his fifth point is the trial court's denial of his request to admit a brief audio recording of Wendy speaking with police in 2005. (Appellant's Brief at 59-67; *see* Def.'s Ex. 3).

On this recording, Wendy has a conversation, in English,[5] with police officers and identifies "Apache" as the shooter; she also says that before his death Hernandez told her that Apache committed another murder. (Def.'s Ex. 3). Defense counsel proffered this recording at the end of trial prior to the close of evidence. (29 RR 60-62). The trial court asked why the recording should not be excluded as hearsay and defense counsel replied that it was not being offered for the truth of the matter asserted, but merely to show that Wendy could speak English. (29 RR 62). The State replied that Wendy had never denied being able to speak

---

[5] The appellant asserts that Wendy speaks "perfect English" on the audio. (Appellant's Brief at 61). While this matter is not terribly important, the State disputes that characterization. Most of her answers are "yes" or "no." She speaks with an accent that, combined with the softness of her voice, leaves some of her comments inaudible. Near the end of the interview an officer asks her if Apache has a car and Wendy says that he does. The officer then asks if Wendy has seen Apache in his car lately, and Wendy says that no, he had sold it. This confusion regarding tense is indicative of a certain lack of fluency and certainly was not an example of "perfect English."

English and had testified that she spoke to the police in English, so the defense's proposed use of this recording was improper impeachment. (29 RR 62). The trial court excluded the recording:

> I think it's been made clear that [Wendy], both from her and from cross[-examination] that she never did ask for an interpreter [during the police interview] and one clearly was not provided for her. So I will let the jury make any conclusions about her ability to speak English from the testimony from the live witnesses.

(29 RR 63).

The trial court's description of the testimony was correct. Wendy said that she spoke with police in English. (25 RR 189, 191-92; 26 RR 22-25, 32, 36, 49-50, 52). The police officer who interviewed Wendy said that he spoke with her in English and had no difficulty understanding her. (26 RR 238-39; 27 RR 33-34, 51). Another police officer who spoke with Wendy testified that he spoke with her in English and Wendy did not request an interpreter. (28 RR 27-28). Aside from Eduardo Herndez's death, Wendy's ability to speak English was the most well-established fact at this trial.

Impeaching a witness consists of introducing evidence that tends to show that the witness is unworthy of belief or credit. *Willingham v. State*, 897 S.W.2d 351, 358 (Tex. Crim. App. 1995). "The law authorizes

five basic methods of impeachment: character, bias, prior inconsistent statements, lack of capacity, and contradiction." Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE. § 607.1 (3d ed. 2002). Defendant's Exhibit 3 does not fall into any of those categories: Had it been admitted for the proffered purpose, all it would have shown that was that Wendy spoke to the police in English. Considering that there was no real contradiction in the evidence on this point, the recording in no way impeached Wendy or any other prosecution witness.

Even if this Court believes that the trial court should have admitted the recording, the fact that the recording (if admitted for the purpose of showing that Wendy spoke English) was cumulative of other evidence means that reversal on this ground would be inappropriate. A trial court's erroneous exclusion of evidence will not result in reversal unless the exclusion affects a party's substantial rights. TEX. R. EVID. 103(a). The improper exclusion of evidence does not effect a party's substantial rights if the excluded evidence was cumulative of evidence admitted elsewhere. *See Mosley v. State,* 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (op. on reh'g) (explaining that the harm from the erroneous exclusion of evidence may be mitigated by the admission of evidence

38

similar to what the appellant wished to offer); *Anderson v. State,* 717 S.W.2d 622, 628 (Tex.Crim.App.1986) (holding that to show harm, the excluded evidence must be controlling on a material issue and not cumulative of other evidence). The jury was repeatedly advised that Wendy spoke English; the appellant could not have been harmed by the trial court's exclusion of evidence whose only purpose was to reiterate that point. Accordingly, this Court should reject the appellant's fourth point.

**Point Six: The appellant's claim is that the trial court violated Rule 615 by not admitting the recording, but Rule 615 is a rule of discovery, not admissibility. The trial court's ruling on admissibility did not implicate Rule 615.**

In his sixth point, the appellant asks whether the trial court "violat[ed] the rule of *Gaskin v. State*[, 353 S.W.2d 467 (Tex. Crim. App. 1961)] by preventing appellant from impeaching [Wendy] with the prior audiotaped statement she gave to the police." (Appellant's Brief at 71). As the appellant notes in his brief, *Gaskin* provided that the State must provide to the defense any statements that witnesses made to the police during the investigation; this has since become part of Rule of Evidence 615. *Smith v. State*, 65 S.W.3d 332, 343 (Tex. App.—Waco 2001, no pet.).

On its face, Rule 615 is not an independent ground for admissibility. *See* TEX. R. EVID. 615. Rule 615(e) provides for the *exclusion* of a witness's testimony if the sponsoring party refuses to provide that witness's prior statement to the other party, but no other part of Rule 615 concerns the admission or exclusion of evidence. The purpose of the rule is to provide parties with witnesses' statements so that those witnesses can be cross-examined, not to admit those statements in lieu of testimony. If Rule 615 was a basis for admitting witnesses' out-of-court statements, it would do great damage to the general rule against hearsay.

The appellant cites to no authority for the proposition that Rule 615 is an independent basis for admissibility, nor did the appellant raise this argument in the trial court. *See Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002) (appellate courts "usually may not reverse a trial court's ruling on any theory or basis that might have been applicable to the case, but was not raised [in the trial court]). This Court should reject the appellant's sixth point because it presents nothing for this Court's review and, if examined, is without merit.

**Reply to Point Seven**

**The jurors were not unduly influenced when someone waived at them.**

At the end of the second day of deliberation, the jury was placed on a bus to be taken to a hotel for sequestration. (32 RR 12). As the bus was beginning to drive off, someone wearing a white sweatshirt waved at the jurors while "smirking." (32 RR 23-25). Because they had seen this man in the courtroom, some of the jurors concluded that he was the appellant's brother. (32 RR 24).

The next morning, the jury resumed deliberations and reached a verdict. After that, the trial court held a brief hearing into the waving incident and what effect, if any, it had on the jury. (32 RR 12). One juror, identified as A.B., testified that she thought the waving was "a tactic to intimidate or threaten"; when asked if she felt threatened, she replied that she felt "cautious." (32 RR 18). After the waving incident, A.B. asked for permission to contact her family "out of caution." (32 RR 18). A.B. said that the next day prior to deliberations, she asked other jurors whether they thought the waver would be in the courtroom that day. (32 RR 20). However, A.B. said she did not know if the waver was in the courtroom because she had not actually seen the waver, she had only

heard about him. (32 RR 20). A.B. said that she did not believe the waving incident affected her ability to be fair and impartial in the punishment phase. (32 RR 21).

The second juror to testify, D.T., said that she actually saw the waver, though she did not know who he was. (32 RR 23-25). D.T. said that she was concerned because she "thought they were supposed to keep people away from us." (32 RR 26). D.T. said that the next morning she mentioned to the deputies guarding the jury that she was concerned, and "[d]ue to the nature of the case … I was going to hold my gun closer at night." (32 RR 26). However, a conversation with one of the deputies put D.T. at ease and she said she was feeling better. (32 RR 27). D.T. said that the incident would not affect her going forward because the incident had "nothing to do with [the appellant]." (32 RR 27).

After this hearing, the appellant moved for a mistrial based on his claim that "the verdict was reached as a result of an outside influence" (32 RR 28). The trial court denied the motion. (32 RR 29). The appellant raises this matter in his seventh point of error. (Appellant's Brief at 75-79).

The standard for analyzing outside-influence claims was recently discussed by this Court in *McQuarrie v. State*, 380 S.W.3d 145 (Tex. Crim.

App. 2012). This analysis consists of determining what outside influence was exerted on the jury, and then determining whether "there is a reasonable possibility that it had a prejudicial effect on the 'hypothetical average juror.'" *McQuarrie*, 380 S.W.3d at 154 (quoting federal caselaw). This is an objective analysis performed by the courts in order to avoid delving into jury deliberations as to whether the influence actually affected the deliberations. *Ibid*.

In *Manley v. AmBase Corp.*, 337 F.3d 237 (2d Cir. 2003), the Second Circuit identified "the three categories [of outside influences] that most frequently raise prejudice concerns": extra-record information being conveyed to jurors; advise to jurors on how to decide the case; and coercion. *Manley*, 337 F.3d at 252. What distinguishes these categories of influence from this case is that they involve the actual conveyance of information to the jury, and it is information whose effect can be analyzed objectively by a court. When, for example, a U.S. marshal tells a jury that there is no such thing as a hung jury and that the jurors will be held until they reach a verdict, it is obvious that this would have some impact on the jury's deliberations. *See Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 919 (7th Cir. 1991).

43

Here, someone who had been in the court room — perhaps the appellant's brother, perhaps not — waved at a bus full of jurors and smirked. That conveyed no information to the jury, thus this Court cannot make an objective determination of what effect, if any, it would have on a hypothetical average juror. Indeed, the testimony from the jurors established that they did not know what to make of this. Whatever fear they had came from a generalized apprehension that was created by the nature of this case. The testifying jurors said that the wave would have no impact on their deliberations going forward, thus it seems reasonable to assume that it had no impact on their guilt-phase deliberations.[6]

The State can find no cases addressing the importance of a gesture as an "outside influence." The State urges this Court to hold that ambiguous, non-verbal, non-communicative conduct from a non-party would not influence a hypothetical average juror. The alternative holding — that a wave and a "smirk" from a stranger on the street is sufficient grounds to overturn a jury verdict — would open up too many cases to claims of outside influence.

---

[6] *Had* the jury interpreted the wave as a threat from the appellant's family, and *had* they allowed that threat to impact their deliberations, it seems that would have pushed them toward acquittal, not conviction.

**The photo lineup was not impermissibly suggestive.**

Prior to trial, the appellant filed a boilerplate "Motion to Suppress Identification" alleging that the State might attempt to introduce at trial an identification that was tainted by impermissibly suggestive procedures. (CR 2982-83). The trial court interpreted this motion as challenging the admissibility of Wendy Bardales's identification of the appellant as the shooter. (25 RR 44). During Wendy's testimony, but before she identified the appellant as the killer, the trial court held a hearing on the motion to suppress. (25 RR 44). After hearing from Wendy, the police officer to whom she made the identification, and a defense expert on eyewitness evidence, the trial court denied the motion. (25 RR 178-79). In his eighth point the appellant asserts that the trial court's ruling was erroneous. (Appellant's Brief at 79-90).

## I. Factual Background

Houston Police Sergeant Tommy Ruland was the lead investigator on this case. (25 RR 79). He first spoke with Wendy on December 6, the night of the murder. (25 RR 80). Although Wendy had seen the shooter's

face, his identity did not register with her and she told the police she did not know who it was. (25 RR 48-51).

The next day, based on information that Israel Diaz had some connection to Hernandez, police showed Wendy a photo lineup that had a picture of Diaz; Wendy picked him out as someone she knew but said that he was not the shooter. (25 RR 51-53, 84-86; State's Ex. 57). That day Wendy also gave a sworn statement to police detailing what she saw and what she remembered about the shooter's appearance. (State's Ex. 160).

On December 12, police showed Wendy a different photo lineup, this time including a picture of the appellant. (25 RR 88-89; State's Ex. 56). Wendy "immediately" pointed out the picture of the appellant and identified him as Apache. (25 RR 94-95). Wendy said that his face looked "exactly like the shooter's face." (25 RR 95). This photo lineup is attached to the State's brief as an appendix.

Regarding what happened next, there are mixed accounts in the record. Wendy testified that in that interview on the 12th she told Ruland that she was positive that the appellant was the shooter. (25 RR 54). This is supported by the handwritten notes on the identification, where Wendy wrote her name and "12/12/05" on the picture of the appellant.

46

(State's Ex. 56). On the back of the photo lineup card Wendy wrote a note in Spanish that was translated to the trial court as stating, "I am positive that he is the one that killed Eduardo." (25 RR 55). That note is not dated. Wendy testified that Ruland came back the next day to ask her if she really was sure that the appellant was the shooter; Wendy testified that there had probably been some lack of communication caused by her limited English skills that had left Ruland confused to her degree of certainty. (25 RR 56-57). At any rate, Wendy said that her identification remained the same. (25 RR 56-57).

Ruland testified from a slightly different perspective. According to Ruland, in the December 12 interview Wendy had said that the appellant "looked like" the shooter, but Ruland was not certain what she meant by this. (25 RR 95). Ruland asked her to clarify, and she responded that "the face was the same and that [the appellant] could be the shooter." (25 RR 96). In his investigation notes, Ruland did not categorize this identification as positive, negative, or tentative, but instead noted that he was confused by what Wendy had said. (25 RR 96-97).

Ruland said that he spoke with Wendy again on December 13 to clear up his confusion. (25 RR 97-98). Ruland said that when he told Wendy that he wanted to clear up his own confusion, she repeated that

47

the appellant "had the same face" as the shooter. (25 RR 100). Wendy told Ruland that the shooter was wearing a hood, which is why she kept talking about the face. (25 RR 100). Ruland asked Wendy to look at the photo spread again, this time covering up the hair on each picture to simulate the effects of wearing a hood. (25 RR 100). According to Ruland, Wendy's "eyes became wide and she covered her mouth. Her eyes started watering. She then said Apache did the killing. She stated she was absolutely positive the male in the picture was the same male that killed [Hernandez]." (25 RR 101). According to Ruland, it was at this point that Wendy "wrote some things on the back [of the photo lineup]." (25 RR 101).

After Ruland testified, the defense presented Roy Malpass, a professor at the University of Texas — El Paso and an expert regarding eyewitness identification. (25 RR 122-124). Malpass testified that he had some "concerns" about the photo lineup from which Wendy identified the appellant. (25 RR 137). He believed that the fillers on the photo lineup were not sufficiently similar to the appellant: the appellant was the only one with "a distinct mark on his left cheek," the appellant was the only one wearing a black hoodie, and three of the people did not have haircuts that could be characterized as "fades," which is how

48

Wendy originally described the suspect. (25 RR 138-39; *see* State's Ex. 56). On a 10-point scale of quality, with 10 being the best, Malpass characterized the lineup in this case as being a 2 or a 3, and stated that there was "a substantial likelihood that a misidentification has been made in this case." (25 RR 150-51). However, Malpass later clarified this comment by stating that he was not commenting on the actual accuracy of Wendy's identification, but rather he was commenting "about whether the photo spread and the procedures used would lend themselves towards error." (25 RR 158-59).

Malpass provided some generalized testimony concerning problems with eyewitness identifications. (25 RR 139-145). He then said that when witnesses make multiple identifications, generally the first identification is the most reliable and subsequent identifications become more and more subject to outside pressures. (25 RR 145). In this case, he said that because Ruland went back to speak with Wendy on December 13, it signaled that something was wrong with the December 12 identification and that is why Wendy's identification became more certain on the 13th. (25 RR 145-46).

After Malpass's testimony, the trial court made findings of fact. It found that the lineup did not appear impermissibly suggestive: "[T]he

49

suspect did not stand out in the six-phot photo array, all subjects ... all light-skinned Hispanic males, they were all of the same general build, all of the same general age range, all had short haircuts." (25 RR 178; *see* State's Ex. 56). The trial court then found that even if the photo lineup were impermissibly suggestive, under controlling legal authority "the totality of the circumstances reveals no substantial likelihood of misidentification ... and [Wendy's] identification testimony is deemed reliable after reviewing the five factors set out in [*Webb v. State*, 760 S.W.2d 263 (Tex. Crim. App. 1988)]." The trial court denied the appellant's motion to suppress. (25 RR 179).

Wendy testified in front of the jury, over the appellant's objection, regarding her pre-trial identification. (25 RR 191-95). She then identified the appellant in the courtroom. (25 RR 197).

## II. Legal Background

A pre-trial identification, and any ensuing in-court identification, must be excluded if the procedure police use to obtain the pre-trial identification is so overly suggestive and conducive to mistaken identification that it infringes upon a defendant's Fourteenth Amendment right to due process of law. See *Barley v. State*, 906 S.W.2d

27, 32-33 (Tex. Crim. App. 1995). In determining whether an in-court identification is properly admissible, courts assess: (1) whether the police used an impermissibly suggestive identification procedure for the pre-trial identification; and (2) whether the procedure resulted in a substantial likelihood of irreparable misidentification. *Barley*, 906 S.W.2d at 33. This two-step analysis also depends upon an evaluation of the totality of the circumstances. *Stovall v. Denno*, 388 U.S. 293, 302 (1967). Identification testimony is admissible if the totality of the circumstances reveals no "substantial likelihood of misidentification." *Cooks v. State*, 844 S.W.2d 697, 731 (Tex. Crim. App. 1992); *Webb*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988). A defendant bears the burden to demonstrate by clear and convincing evidence that the pre-trial identification is unreliable. *Cooks*, 844 S.W.2d at 731; *Harris v. State*, 827 S.W.2d 949, 959 (Tex. Crim. App. 1992).

If a court believes that the procedure was suggestive, to determine whether that procedure created a likelihood of false identification there are five factors to look at: 1.) The opportunity of the witness to view the criminal at the time of the crime; 2.) The witness's degree of attention; 3.) The accuracy of the witness's prior description of the criminal; 4.) The level of certainty demonstrated by the witness at the

confrontation; and 5.) The length of time between the crime and the confrontation. *Loserth v. State*, 963 S.W.2d 770, 772-73 (Tex. Crim. App. 1998) (citing *Neil v. Biggers,* 409 U.S. 188, 199 (1972)).

Whether a photographic identification procedure was impermissibly suggestive is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor; therefore the trial court's decision is reviewed de novo. See *Id.* at 772-73. However, whether, under the totality of the circumstances, there was a substantial likelihood of misidentification is question of historical fact, and as such an appellate court gives deference to the trial court's findings. *Id*. at 773-74.

## III. Argument

### A. The appellant did not "st[i]ck out like a sore thumb" in the photo lineup.

The appellant claims that the photo lineup was "obviously suggestive" for three reasons: "The Appellant's photo was the only one of the six with a mark on his face and the only person wearing a hoodie. … Appellant was the only individual closely resembling the pre-procedure description." (Appellant's Brief at 83-84). According to the

appellant, this made his picture "st[i]ck out like a sore thumb." (Appellant's Brief at 84).

In her statement, Wendy gave the following description of the shooter:

> He was Hispanic and about 16-17 years old. He was around 5 foot 6 inches to 5 foot 7 inches tall. I remember him having a dark birth mark on his face but I can't remember exactly where. He was very skinny and clean shaven. He had black hair, it was short. He had a fade type haircut. He was wearing a black sweat shirt hooded jacket and khaki pants.

(State's Ex. 160).

Looking at the photo lineup, there are numerous similarities between all six: They are all young, Hispanic men who might plausibly be in their late teens; they all have short black hair; and, except for one with a light mustache, are clean-shaven. Several of them might well qualify as "skinny," which is a fairly subjective term, particularly when all that is shown is the face. In none of the six pictures is it apparent how tall the individuals were. Additionally, at the time of the photo lineup Wendy was admonished that individuals might be wearing different clothing in the photo lineup, that their hair might be different, or that their skin tone might be different depending on the lighting. (25 RR 91).

As to the supposed differences that the appellant points out in his brief, the State disputes his assertion that none of the other individuals were wearing a hoodie or had a mark on his face. The appellant's picture appears in the middle of the bottom row. In the left-hand picture on the bottom row is an individual wearing a grey hoodie. In the right-hand picture of the upper row is an individual wearing some sort of black sweater or jacket with a thick collar that could be a hoodie with the hood inverted. At any rate, Wendy was advised that the individuals could be wearing different attire than on the night of the killing. (25 RR 91).

Regarding the mark on his face, the individual in the left side of the top row has a mark on the left side of his neck and perhaps a mark on the left side of his face. The individual in the middle of the top row has some sort of injury or tattoo on the left side of his face that is at least as prominent as the mark on the left side of the appellant's face. For the other three individuals, they all have parts of their faces obscured by shadow or camera angle; because Wendy said she did not remember which part of his face had a mark on it, it is possible that the mark could have been in one of these obscured areas.

## B. The totality of the circumstances does not show a substantial likelihood of misidentification.

Reviewing the *Biggers* factors shows that there is adequate support for the trial court's finding that the totality of the circumstances does not show a substantial likelihood of misidentification. Wendy testified that she had a good opportunity to view the shooter when his hood fell off. (25 RR 47-48). Wendy said that, though she was shocked and could not move during the shooting, she kept her eyes on the shooter. (25 RR 46).

Regarding the third *Biggers* factor, Wendy gave police a description of the shooter that fairly well matches up with the appellant. (State's Ex. 160). In his brief, the appellant takes conflicting positions on the accuracy of her description. In arguing that the lineup was too suggestive, he asserts that the appellant was "the only individual closely resembling the pre-procedure description." (Appellant's Brief at 84). However, in his argument about the totality of the circumstances he asserts that Wendy's pre-identification description was "way off." (Appellant's Brief at 87).

The State believes that the appellant was correct the first time. The only inaccuracies he mentions from her pre-identification are

irrelevant. First, he points out that she originally said that the shooter had a black gun, but the murder weapon turned out to be black. (Appellant's Brief at 87). This does not detract from the accuracy of her description of the *shooter*; indeed, it could add to because it demonstrates that she was looking at the shooter's face and not the gun. (*See* 25 RR 142-44 (defense expert describing how "weapon focus" sometimes causes witnesses to focus on a gun rather than the shooter's face)).

The second inaccuracy that the appellant points to is that Wendy originally told the police that the shooter had a "birth mark," but at trial she described the mark on the appellant's face as a "mole." (*Compare* State's Ex. 160 *to* 25 RR 71-72). Considering that English was not Wendy's first language, any failure on her part to grasp the difference between a mole and a birthmark is such a minor thing that this Court should disregard it. *See* American Academy of Dermatology, "Different Kinds of Birthmarks," https://www.aad.org/dermatology-a-to-z/for-kids/about-skin/birthmarks/different-kinds-of-birthmarks (last visited June 24, 2015) ("If you are born with a mole, it is considered a birthmark.... But not all moles are birthmarks.").

The third inaccuracy that the appellant points out is that Wendy originally told police that the appellant fired at her repeatedly, but the ballistics from the crime scene showed that this had not been the case. (*Compare* State's Ex. 160 *to* 28 RR 121, 123). However, the ballistics testimony was not admitted until after the trial court ruled on the motion to suppress, thus the appellant cannot use that fact to assert that the trial court abused its discretion in denying his motion to suppress. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) (rulings on motion to suppress reviewed based on evidence before trial court at time of ruling). Additionally, this inaccuracy does not undermine Wendy's identification of the shooter.

Regarding the fourth and fifth *Biggers* factors, Wendy made her identification within a week of the shooting, and she was completely certain in that identification, even if there was some confusion in how that certainty was conveyed to the police.

In conclusion, the lineup in this case was not impermissibly suggestive. Moreover, the trial court's determination that, even if there were a level of suggestiveness, the totality of the circumstances do not show a substantial chance of misidentification is well-supported by the

record and this Court should defer to that determination and overrule the appellant's eighth point of error.

**Reply to Point Nine**

**The jury's note to the trial court did not indicate a point of disagreement, therefore the trial court was correct in its decision not to have testimony read back in response to that note.**

The jury in this case was uncommonly communicative, sending out no fewer than 22 requests for testimony to be read back to them, in addition to numerous notes requesting physical evidence. (*See* CR 3285-3319). The appellant's ninth point of error relates to the trial court's determination that one of these notes did not reflect a disagreement about testimony and thus there was no need to have the requested testimony read back to the jury.

On the first day of deliberation, the jury sent out a note that concerned the testimony of Sergeant Ruland and asked "to hear when the defense asked Officer [Ruland] if he would question Wendy's credibility if she knew [the appellant] prior to the incident." (CR 3295). The trial court replied in writing that there was "no testimony in the record that is specifically responsive to the question." (CR 3296). The trial court asked the jurors to "explain the dispute that you have among

yourselves" so that it could "find a responsive answer." (CR 3296). The next day the jury sent out a note requesting "to hear [Ruland's] testimony where the witness was asked if Wendy's credibility would be different if there was evidence that her relationship with [the appellant] was more involved." (CR 3297).

The parties held a discussion on the record concerning this second note. (31 RR 4-7). The reporter's record seems to pick up mid-discussion, because defense counsel asked to have testimony read back to the jury, though he did not specify what testimony he wished to have read back. (31 RR 4-5). A prosecutor then replied that she believed the question concerned different testimony than that which defense counsel wished to have read back. (31 RR 5). The trial court said that it would reply to the note by instructing the jurors "to be specific as to the point in dispute." (31 RR 5; *see* CR 3297). Defense counsel "vehemently object[ed]" to this, stating that the trial court's response was "disrespecting the jury" because "[t]hey have clearly indicated what it is that they want." (31 RR 5). The trial court overruled this objection. (31 RR 6).

The defense then admitted into evidence Defendant's Exhibit 9, which is a portion of testimony in which Ruland explained that Wendy

59

said she had last seen the appellant "approximately six months" prior to the shooting. (Def.'s Ex. 9). In the testimony, Ruland was asked whether "if [Wendy] had later said to investigators or testified that it was two weeks prior to the incident, would that cause you to question her credibility or veracity?" (Def.'s Ex. 9). Ruland replied, "Yes." (Def.'s Ex. 9).

On appeal, a trial court's decision of whether to have testimony read back to the jury in response to a question is reviewed only for an abuse of discretion. *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005). Article 36.28 authorizes trial courts to have testimony read back to the jury, but only if there is "disagree[ment] as to the statement." TEX. CODE CRIM. PROC. art. 36.28. The jury must indicate its disagreement to the trial court so that the trial court will know what testimony is responsive to that disagreement. *Moore v. State*, 874 S.W.2d 671, 674 (Tex. Crim. App. 1994). "[A] request for testimony, without more, is not an indication of implicit disagreement." *Ibid*.

The jury's note in this case did not indicate disagreement. Even after the trial court requested that the jury "explain the dispute," the jury's note consisted only of a statement that they wanted to hear particular testimony. (CR 3297). While it is true, as the appellant points out, that the case law allows a trial court in this situation to infer a

dispute, nothing in the case law requires a trial court to do so. *Cf.* *Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994) (where trial court replies to jury note by instructing on need for disagreement and jury sends back note not explicitly mentioning disagreement, trial court does not abuse discretion by inferring disagreement). Here, because the jury note did not describe a point that was in dispute, the trial court did not abuse its discretion by not having testimony read back to the jury.

Moreover, it is worth noting that the testimony in Defendant's Exhibit 9 is not responsive to the jury's request. The jurors asked for testimony regarding how Wendy's "relationship" with the appellant would impact Ruland's assessment of her credibility. In the context of the trial, this "relationship" question was plainly a reference to Wendy's testimony that she had hung out at the appellant's apartment a few times and talked with the appellant. (*See* 26 RR 61). Defense counsel asked Wendy if the appellant had grabbed Wendy by the hair and thrown her out of his apartment and Wendy replied that she did not recall that happening. (26 RR 61-62). Ruland did not testify to the "relationship" between Wendy and the appellant; the testimony in Defendant's Exhibit 9 regards when Wendy had last seen the appellant, not the depth of their relationship.

The trial court did not abuse its discretion in declining to have an irrelevant section of testimony read back to the jury in response to a note that did not indicate a point in dispute. This Court should reject the appellant's ninth point.

## Conclusion

The State respectfully submits that all things are regular and the judgment of the trial court should be affirmed.

**DEVON ANDERSON**
District Attorney
Harris County, Texas


/s/ C.A. Morgan
**CLINTON A. MORGAN**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
713.755.5826
Texas Bar No. 24071454

## Certificate of Compliance and Service

I certify that, according to Microsoft Word's word counting function, the portion of this brief for which Rule of Appellate Procedure 9.4(i)(1) requires a word count contains 13,183 words.

I also certify that I have requested that efile.txcourts.gov electronically serve a copy of this brief to:

R. Scott Shearer
shearerleagl@yahoo.com

/s/ C.A. Morgan
**CLINTON A. MORGAN**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002-1923
(713) 755-5826
Texas Bar No. 24071454

Date: June 24, 2015

# Appendix: State's Exhibit 56

STATE'S
EXHIBIT
56

PENGAD 800-631-6989











